JUDGE BATTS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

10 CIV 4421

------------------------------------------------------------------x

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for RIVERSIDE
NATIONAL BANK OF FLORIDA,

                              Plaintiff,

        - against -

THE MCGRAW-HILL COMPANIES, INC.,
MOODY'S INVESTORS SERVICE, INC., FITCH,
INC., TABERNA CAPITAL MANAGEMENT, LLC,
TRAPEZA CAPITAL MANAGEMENT, LLC,
COHEN & COMPANY FINANCIAL
MANAGEMENT, LLC f/k/a COHEN BROS.
FINANCIAL MANAGEMENT LLC, FTN
FINANCIAL CAPITAL MARKETS, KEEFE
BRUYETTE & WOODS, INC., MERRILL LYNCH,
PIERCE, FENNER & SMITH, INC., JPMORGAN
CHASE & CO., J.P. MORGAN SECURITIES INC.,
CITIGROUP GLOBAL MARKETS, CREDIT
SUISSE SECURITIES (USA) LLC, ABN AMRO,
INC., COHEN & COMPANY, and SUNTRUST
ROBINSON HUMPHREY, INC.,

                         Defendants.

**NOTICE OF REMOVAL**

------------------------------------------------------------------x

      The undersigned Defendants, by and through their attorneys, hereby remove the

above-captioned matter bearing Index No. 650665/2009, pursuant to 28 U.S.C. § 1446,

12 U.S.C. § 1819(b)(2)(A) and all applicable Local Rules of the United States District

Court for the Southern District of New York, from the Supreme Court of the State of

New York, County of New York (the "New York County Supreme Court") to the United

States District Court for the Southern District of New York.  In support of removal,

Defendants state as follows:

## Relevant Procedural History

1.      On November 13, 2009, Riverside National Bank of Florida ("Riverside")

filed this action in the New York County Supreme Court.  Riverside was thereafter closed

by the Office of the Comptroller of the Currency, and the Federal Deposit Insurance

Corporation (the "FDIC") was named Receiver.

2.      On May 4, 2010, the FDIC as Receiver for Riverside filed a notice of

motion returnable May 12, 2010 before the New York County Supreme Court, for an

Order substituting the FDIC, the real party-in-interest in the present action, as Plaintiff in

the place and stead of Riverside.  A copy of the FDIC's notice of motion is attached

hereto as Exhibit A.

3.      On May 10, 2010, Defendants notified the New York County Supreme

Court that Defendants did not oppose the FDIC's motion for substitution as Plaintiff.

The New York Supreme Court granted the motion on May 18, 2010.  A copy of the New

York Supreme Court's order granting the motion is attached hereto as Exhibit B.

## Jurisdiction of This Court

4.      Under 12 U.S.C. § 1819(b)(2)(A), subject to an exception not relevant

here, "all suits of a civil nature at common law or in equity to which the [FDIC], in any

capacity, is a party shall be deemed to arise under the laws of the United States."

Accordingly, this action arises under the laws of the United States, and falls within this

Court's "original jurisdiction of all civil actions arising under the Constitution, laws, or

treaties of the United States." 28 U.S.C. § 1331.

5.      Removal is proper under 28 U.S.C. § 1441.  28 U.S.C. § 1441(a) provides

in pertinent part that "[e]xcept as otherwise expressly provided by Act of Congress, any

civil action brought in a State court of which the district courts of the United States have

original jurisdiction, may be removed by the defendant or the defendants, to the district

court of the United States for the district and division embracing the place where such

action is pending."  28 U.S.C. § 1441(b) further provides that "[a]ny civil action of which

the district courts have original jurisdiction founded on a claim or right arising under the

Constitution, treaties or laws of the United States shall be removable without regard to

the citizenship or residence of the parties."

### Timeliness of Removal and Satisfaction of Procedural Requirements

6.      Removal is timely under 28 U.S.C. § 1446(b), which provides, *inter alia*,

that "[i]f the case stated by the initial pleading is not removable, a notice of removal may

be filed within thirty days after receipt by the defendant, through service or otherwise, of

a copy of an amended pleading, motion, order or other paper from which it may first be

ascertained that the case is one which is or has become removable."

7.      All of the current Defendants[1] consent to the removal of this action to

federal court and have joined in this Notice of Removal.

8.      A copy of all process, pleadings, and orders served on Defendants in this

action is attached hereto as Exhibit C, as required by 28 U.S.C. §1446(a).

9.      Promptly after the filing of this Notice of Removal, Defendants will give

written notice of the filing to Plaintiff and file a copy of such notice with the clerk of the

Court for the New York County Supreme Court pursuant to 28 U.S.C. § 1446(c).

---

[1] This action was voluntarily discontinued as against JPMorgan Chase & Co. on
December 10, 2009, so its consent is not required.

3

Dated: New York, New York
      June 3, 2010

                                    Respectfully submitted,

CAHILL GORDON & REINDEL LLP          SATTERLEE STEPHENS BURKE &
                                     BURKE LLP

By: _____         By: _____
      Floyd Abrams                         Joshua M. Rubins
      Adam Zurofsky                        James J. Coster
      Brian Markley                        Glenn C. Edwards
      Michael Wernke                 230 Park Avenue, 11th Floor
80 Pine Street                       New York, NY  10169-0079
New York, NY 10005-1702              (212) 818-9200
(212) 701-3000

*Attorneys for McGraw-Hill Companies, Inc.*   *Attorneys for Moody's Investors Service, Inc.*

PAUL, WEISS, RIFKIND, WHARTON &      FRIEDMAN KAPLAN SEILER &
GARRISON LLP                         ADELMAN LLP

By: _____         By: _____
      Martin Flumenbaum                    Edward A. Friedman
      Roberta Kaplan                       Robert J. Lack
      Andrew J. Ehrlich                     Amy K. Penn
1285 Avenue of the Americas          1633 Broadway
New York, NY 10019-6064              New York, NY 10019-6708
(212) 373-3000                       (212) 833-1100

*Attorneys for Fitch, Inc.*          *Attorneys for Taberna Capital Management, LLC*

4

Dated: New York, New York
    June 3, 2010

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

SATTERLEE STEPHENS BURKE &
BURKE LLP

By: _____

By _____

    Floyd Abrams
    Adam Zurofsky
    Brian Markley
    Michael Wernke
80 Pine Street
New York, NY 10005-1702
(212) 701-3000

    Joshua M. Rubins
    James J. Coster
    Glenn C. Edwards
230 Park Avenue, 11th Floor
New York, NY 10169-0079
(212) 818-9200

*Attorneys for McGraw-Hill Companies, Inc.*

*Attorneys for Moody's Investors Service,
Inc.*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

FRIEDMAN KAPLAN SEILER &
ADELMAN LLP

By: _____

By: _____

    Martin Flumenbaum
    Roberta Kaplan
    Andrew J. Ehrlich
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

    Edward A. Friedman
    Robert J. Lack
    Amy K. Penn
1633 Broadway
New York, NY 10019-6708
(212) 833-1100

*Attorneys for Fitch, Inc.*

*Attorneys for Taberna Capital
Management, LLC*

4

Dated: New York, New York
    June 3, 2010

                                        Respectfully submitted,

CAHILL GORDON & REINDEL LLP            SATTERLEE STEPHENS BURKE &
                                       BURKE LLP


By: _____           By: _____
        Floyd Abrams                           Joshua M. Rubins
        Adam Zurofsky                          James J. Coster
        Brian Markley                          Glenn C. Edwards
        Michael Wernke                 230 Park Avenue, 11th Floor
80 Pine Street                         New York, NY  10169-0079
New York, NY 10005-1702                (212) 818-9200
(212) 701-3000

*Attorneys for McGraw-Hill Companies, Inc.*   *Attorneys for Moody's Investors Service,*
                                              *Inc.*

PAUL, WEISS, RIFKIND, WHARTON &        FRIEDMAN KAPLAN SEILER &
GARRISON LLP                           ADELMAN LLP


By: *Martin Flumenbaum*                By: _____
        Martin Flumenbaum                      Edward A. Friedman
        Roberta Kaplan                         Robert J. Lack
        Andrew J. Ehrlich                      Amy K. Penn
1285 Avenue of the Americas            1633 Broadway
New York, NY 10019-6064                New York, NY 10019-6708
(212) 373-3000                         (212) 833-1100

*Attorneys for Fitch, Inc.*            *Attorneys for Taberna Capital*
                                       *Management, LLC*

4

Dated: New York, New York
     June 3, 2010

                                  Respectfully submitted,

CAHILL GORDON & REINDEL LLP          SATTERLEE STEPHENS BURKE &
                                      BURKE LLP

By: _____       By: _____
     Floyd Abrams                     Joshua M. Rubins
     Adam Zurofsky                 James J. Coster
     Brian Markley                 Glenn C. Edwards
     Michael Wernke         230 Park Avenue, 11th Floor
80 Pine Street                     New York, NY  10169-0079
New York, NY 10005-1702       (212) 818-9200
(212) 701-3000

*Attorneys for McGraw-Hill Companies, Inc.*    *Attorneys for Moody's Investors Service,
Inc.*

PAUL, WEISS, RIFKIND, WHARTON &    FRIEDMAN KAPLAN SEILER &
GARRISON LLP                     ADELMAN LLP

By: _____       By: _____
     Martin Flumenbaum              Edward A. Friedman
     Roberta Kaplan               Robert J. Lack
     Andrew J. Ehrlich             Amy K. Penn
1285 Avenue of the Americas     1633 Broadway
New York, NY 10019-6064       New York, NY 10019-6708
(212) 373-3000                   (212) 833-1100

*Attorneys for Fitch, Inc.*           *Attorneys for Taberna Capital
Management, LLC*

COVINGTON & BURLING LLP

By: _____
        C. William Phillips
        Mark P. Gimbel
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1081

*Attorneys for Trapeza Capital Management,
LLC*

GOODWIN PROCTER LLP


By: _____
        Mary K. Dulka
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 459-7278

*Attorneys for FTN Financial Capital Markets*

*Of Counsel:*
Mark D. Griffin
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
First Tennessee Building, Suite 2000
165 Madison Avenue
Memphis, TN 38103
(901) 526-2000

DLA PIPER LLP (US)

By: _____
        Timothy E. Hoeffner
1251 Avenue of the Americas
New York, NY 10020-1104
(212) 335-4500

*Attorneys for Cohen & Company Financial
Management, LLC f/k/a Cohen Bros.
Financial Management, LLC, and Cohen &
Company*

EISEMAN LEVINE LEHRHAUPT &
KAKOYIANNIS, P.C.


By: _____
        Eric R. Levine
        Eric P. Heichel
        Eric Aschkenasy
805 Third Avenue
New York, NY 10022
(212) 752-1939

*Attorneys for Keefe Bruyette & Woods, Inc.*

5

COVINGTON & BURLING LLP

By: _____
        C. William Phillips
        Mark P. Gimbel
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1081

*Attorneys for Trapeza Capital Management, LLC*

GOODWIN PROCTER LLP

By: _____
        Mary K. Dulka
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 459-7278

*Attorneys for FTN Financial Capital Markets*

*Of Counsel:*
Mark D. Griffin
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
First Tennessee Building, Suite 2000
165 Madison Avenue
Memphis, TN 38103
(901) 526-2000

DLA PIPER LLP (US)

By: _____
        Timothy E. Hoeffner
1251 Avenue of the Americas
New York, NY 10020-1104
(212) 335-4500

*Attorneys for Cohen & Company Financial Management, LLC f/k/a Cohen Bros. Financial Management, LLC, and Cohen & Company*

EISEMAN LEVINE LEHRHAUPT &
KAKOYIANNIS, P.C.

By: _____
        Eric R. Levine
        Eric P. Heichel
        Eric Aschkenasy
805 Third Avenue
New York, NY 10022
(212) 752-1939

*Attorneys for Keefe Bruyette & Woods, Inc.*

5

COVINGTON & BURLING LLP

By: _____
        C. William Phillips
        Mark P. Gimbel
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1081

*Attorneys for Trapeza Capital Management, LLC*

GOODWIN PROCTER LLP

By: *Mary K. Dulka*
        Mary K. Dulka
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 459-7278

*Attorneys for FTN Financial Capital Markets*

*Of Counsel:*
Mark D. Griffin
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
First Tennessee Building, Suite 2000
165 Madison Avenue
Memphis, TN 38103
(901) 526-2000

DLA PIPER LLP (US)

By: _____
        Timothy E. Hoeffner
1251 Avenue of the Americas
New York, NY 10020-1104
(212) 335-4500

*Attorneys for Cohen & Company Financial Management, LLC f/k/a Cohen Bros. Financial Management, LLC, and Cohen & Company*

EISEMAN LEVINE LEHRHAUPT & KAKOYIANNIS, P.C.

By: _____
        Eric R. Levine
        Eric P. Heichel
        Eric Aschkenasy
805 Third Avenue
New York, NY 10022
(212) 752-1939

*Attorneys for Keefe Bruyette & Woods, Inc.*

COVINGTON & BURLING LLP

By: _____
       C. William Phillips
       Mark P. Gimbel
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1081

*Attorneys for Trapeza Capital Management,*
*LLC*

GOODWIN PROCTER LLP

By: _____
       Mary K. Dulka
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 459-7278

*Attorneys for FTN Financial Capital Markets*

*Of Counsel:*
Mark D. Griffin
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
First Tennessee Building, Suite 2000
165 Madison Avenue
Memphis, TN 38103
(901) 526-2000

DLA PIPER LLP (US)

By: _____
       Timothy E. Hoeffner
1251 Avenue of the Americas
New York, NY 10020-1104
(212) 335-4530

*Attorneys for Cohen & Company Financial*
*Management, LLC f/k/a Cohen Bros.*
*Financial Management, LLC, and Cohen &*
*Company*

EISEMAN LEVINE LEHRHAUPT &
KAKOYIANNIS, P.C.

By: _____
       Eric R. Levine
       Eric P. Heichel
       Eric Aschkenasy
805 Third Avenue
New York, NY 10022
(212) 752-1939

*Attorneys for Keefe Bruyette & Woods, Inc.*

5

SHEARMAN & STERLING LLP

By: _____
      Herbert S. Washer
      Adam S. Hakki
      Andrew C. Agor
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000

*Attorneys for Merrill Lynch, Pierce, Fenner &*
*Smith, Inc. and ABN Amro, Inc.*


FRESHFIELDS BRUCKHAUS DERINGER
US LLP


By: _____
      Marshall H. Fishman
      Gabrielle L. Gould
520 Madison Avenue
New York, NY 10022
(212) 277-4000

*Attorneys for Citigroup Global Markets*


CRAVATH, SWAINE & MOORE LLP


By: _____
      Robert H. Baron
      Kevin J. Orsini
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

*Attorneys for J.P. Morgan Securities Inc.*


RICHARDS KIBBE & ORBE LLP


By: _____
      H. Rowan Gaither IV
One World Financial Center
New York, NY 10281-1003
(212) 530-1800

*Attorneys for Credit Suisse Securities (USA)*
*LLC and SunTrust Robinson Humphrey,*
*Inc.*

6

SHEARMAN & STERLING LLP

By: _____
      Herbert S. Washer
      Adam S. Hakki
      Andrew C. Agor
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000

*Attorneys for Merrill Lynch, Pierce, Fenner &*
*Smith, Inc. and ABN Amro, Inc.*

FRESHFIELDS BRUCKHAUS DERINGER
US LLP

By: _____
      Marshall H. Fishman
      Gabrielle L. Gould
520 Madison Avenue
New York, NY 10022
(212) 277-4000

*Attorneys for Citigroup Global Markets*

CRAVATH, SWAINE & MOORE LLP

By: _____
      Robert H. Baron
      Kevin J. Orsini
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

*Attorneys for J.P. Morgan Securities Inc.*

RICHARDS KIBBE & ORBE LLP

By: _____
      H. Rowan Gaither IV
One World Financial Center
New York, NY 10281-1003
(212) 530-1800

*Attorneys for Credit Suisse Securities (USA)*
*LLC and SunTrust Robinson Humphrey,*
*Inc.*

6

SHEARMAN & STERLING LLP

By: _____
     Herbert S. Washer
     Adam S. Hakki
     Andrew C. Agor
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000

*Attorneys for Merrill Lynch, Pierce, Fenner & Smith, Inc. and ABN Amro, Inc.*

FRESHFIELDS BRUCKHAUS DERINGER US LLP

By: _____
     Marshall H. Fishman
     Gabrielle L. Gould
520 Madison Avenue
New York, NY 10022
(212) 277-4000

*Attorneys for Citigroup Global Markets*

CRAVATH, SWAINE & MOORE LLP

By: _____
     Robert H. Baron
     Kevin J. Orsini
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

*Attorneys for J.P. Morgan Securities Inc.*

RICHARDS KIBBE & ORBE LLP

By: _____
     H. Rowan Gaither IV
One World Financial Center
New York, NY 10281-1003
(212) 530-1800

*Attorneys for Credit Suisse Securities (USA) LLC and SunTrust Robinson Humphrey, Inc.*

6

SHEARMAN & STERLING LLP

By: _____
     Herbert S. Washer
     Adam S. Hakki
     Andrew C. Agor
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000

*Attorneys for Merrill Lynch, Pierce, Fenner & Smith, Inc. and ABN Amro, Inc.*

FRESHFIELDS BRUCKHAUS DERINGER US LLP

By: _____
     Marshall H. Fishman
     Gabrielle L. Gould
520 Madison Avenue
New York, NY 10022
(212) 277-4000

*Attorneys for Citigroup Global Markets*

CRAVATH, SWAINE & MOORE LLP

By: _____
     Robert H. Baron
     Kevin J. Orsini
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

*Attorneys for J.P. Morgan Securities Inc.*

RICHARDS KIBBE & ORBE LLP

By: _____
     H. Rowan Gaither IV
One World Financial Center
New York, NY 10281-1003
(212) 530-1800

*Attorneys for Credit Suisse Securities (USA) LLC and SunTrust Robinson Humphrey, Inc.*

# EXHIBIT A

**By order of Justice Ramos, these motion papers may not be taken apart or otherwise tampered with.**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------- X

RIVERSIDE NATIONAL BANK OF FLORIDA                               )
                                                                 )    Index No.: 650665/2009
                                    Plaintiff,                   )    Part 53
                                                                 )    Hon. Charles E. Ramos
                        v.                                       )
                                                                 )
THE MCGRAW-HILL COMPANIES, INC., ET AL.,                         )    Motion Sequence No.007
                                                                 )
                                    Defendants.                  )
---------------------------------------------------------------- X

## NOTICE OF MOTION TO SUBSTITUTE THE FDIC AS PLAINTIFF
## AND STAY THIS ACTION FOR 90 DAYS

PLEASE TAKE NOTICE that, upon the Affirmation of Joel P. Laitman, dated May 4, 2010, the exhibits annexed thereto, and the accompanying Memorandum of Law, Plaintiff Federal Deposit Insurance Corporation as Receiver for Riverside National Bank of Florida ("FDIC") will move under C.P.L.R. §§ 1016, 1017, 1018, 1021 and 12 U.S.C. § 1821(d)(12) before this Court in the Motion Support Office Courtroom (Room 130) at the Courthouse thereof, 60 Centre Street, New York, New York, on the 12th day of May, 2010 at 9:30 a.m. for an Order substituting Plaintiff FDIC, the real party at interest in the above-captioned lawsuit, in the place and stead of Riverside National Bank of Florida, and staying this litigation for 90 days from the date the Court issues an order granting the substitution sought herein.

Dated:    New York, New York
          May 4, 2010

Respectfully submitted,

Joel P. Laitman
Christopher Lometti
Daniel B. Rehns
Kenneth M. Rehns
COHEN MILSTEIN SELLERS & TOLL PLLC
150 East 52nd Street, Thirtieth Floor
New York, New York 10022
Telephone: (212) 838-7797

Steven J. Toll
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600

*Attorneys for Plaintiff*
*Federal Deposit Insurance Corporation as*
*Receiver for Riverside National Bank of Florida*

2

# EXHIBIT B

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

Index Number : 650665/2009

**RIVERSIDE NATIONAL**

VS.

**MCGRAW-HILL COMPANIES, INC.,**

SEQUENCE NUMBER : 007

AMEND CAPTION/PARTIES

PART _____

INDEX NO. _____

MOTION DATE _____

MOTION SEQ. NO. _____

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

**Cross-Motion:** ☐ **Yes** ☐ **No**

Upon the foregoing papers, it is ordered that this motion

Is granted without opposition.

The parties shall contact Part 53 on September 6, 2010 @ 4PM to advise as to the status of the action.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

RECEIVED

JUN 0 1 2010

MOTION SUPPORT OFFICE
NYS SUPREME COURT - CIVIL

Dated: _____5/18/2010_____

_____
CHARLES E. RAMOS

**Check one:** ☐ **FINAL DISPOSITION** ☒ **NON-FINAL DISPOSITION**

**Check if appropriate:** ☐ **DO NOT POST** ☐ **REFERENCE**

# EXHIBIT C

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------------- X

RIVERSIDE NATIONAL BANK OF FLORIDA )
)
            Plaintiff, )
)
       v. )
)
THE MCGRAW-HILL COMPANIES, INC., )  VERIFIED COMPLAINT
MOODY'S INVESTORS SERVICE, INC., FITCH, )
INC., TABERNA CAPITAL MANAGEMENT, LLC, )
TRAPEZA CAPITAL MANAGEMENT, LLC, )
COHEN & COMPANY FINANCIAL )
MANAGEMENT, LLC f/k/a COHEN BROS. )
FINANCIAL MANAGEMENT LLC, FTN )  Index No.:
FINANCIAL CAPITAL MARKETS, KEEFE )
BRUYETTE & WOODS, INC., MERRILL LYNCH, )
PIERCE, FENNER & SMITH, INC., JPMORGAN )
CHASE & CO., J.P. MORGAN SECURITIES INC., )
CITIGROUP GLOBAL MARKETS., CREDIT )
SUISSE SECURITIES (USA) LLC, ABN AMRO, )
INC., COHEN & COMPANY, and SUNTRUST )
ROBINSON HUMPHREY, INC., )
)
           Defendants. )
)
)
)
)

---------------------------------------------------------------- X

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................................................ - 1 -

II.  PARTIES ........................................................................................................... - 8 -

III.  JURISDICTION & VENUE ............................................................................ - 13 -

IV.  FACTUAL ALLEGATIONS ........................................................................... - 13 -

    A.  Background ............................................................................................ - 13 -

        1.  Collateralized Debt Obligations .............................................. - 13 -

        2.  Trust Preferred CDOs .............................................................. - 14 -

        3.  REIT CDOs .............................................................................. - 15 -

        4.  Insurance CDOs ....................................................................... - 15 -

    B.  Material Misrepresentations and Omissions ........................................ - 16 -

        1.  The Offering Material Provided That the CDOs Were
            Being Sold "On Condition" of Investment Grade Rating ...................... - 16 -

        2.  The Offering Circulars and Marketing Books Failed to Identify
            the CDO Collateral and Instead Employed the RA Defendants  as
            Gatekeepers of Collateral "Eligibility" ................................................. - 17 -

        3.  The Offering Materials Failed to Disclose the RA Defendants'
            Shadow Ratings of the CDO Collateral ................................................. - 18 -

        4.  The Offering Materials Failed to Disclose  the RA Defendants'
            Conflicts of Interest .............................................................................. - 19 -

        5.  The Offering Materials Failed to Disclose that the RA Defendants
            Served As Both "Coach" and "Referee" ................................................. - 20 -

        6.  The  Offering Materials Failed to Disclose Sellers and Managers' Sales
            Scheme of Selling CDOs Back to Collateral Issuers Undermined
            Diversification ...................................................................................... - 22 -

    C.  The Correction of the CDO Ratings Methodologies Shortly After Issuance
       Confirms that the Ratings Were Inflated and Erroneous ...................................... - 23 -

    D.  The Unprecedented Collapse of the CDOs' Ratings Shortly After Issuance
       Further Confirms that the Ratings Were Inflated and Erroneous ........................ - 25 -

i

E. The Near Immediate Default and/or Deferral of CDOs Further Confirms the Inflation of CDO Ratings ........................................................................- 27 -

F. Riverside Reasonably Relied on the Misrepresentations and Omissions Contained in the Offering Materials ...........................................- 30 -

  1. Investment Policies ...............................................................- 30 -

G. 2008 Governmental Investigations Reveal RA Defendants' Undisclosed Conflicts of Interest; Use of Defective Models; and Sellers' CDO Rating Shopping Practices ..............................................................................- 31 -

  1. July 2008 SEC Report Discloses RA Defendants' Undisclosed Conflicts of Interest in Rating and Structuring CDOs ..........................- 31 -

  2. October 2008 Testimony Before House Oversight Committee Details Defective CDO Ratings Models, Conflicts of Interest and Ratings Shopping ....................................................................................- 36 -

  3. 2009 Congressional Oversight Panel Report .........................................- 43 -

  4. 2009 Congressional Testimony By Former Moody's Managing Director Again Attacks Moody's CDOs Rating Methodology..............- 44 -

  5. RA Defendants' Corrections of Prior Erroneous CDO Rating Methodologies ...........................................................................................- 45 -

  6. The Sellers and RA Defendants were Incentivized to Inflate CDO Ratings ...........................................................................................- 48 -

V. CDO MISREPRESENTATIONS AND OMISSIONS AND THEIR EFFECT ON CDO RATINGS AND VALUE .........................................................- 49 -

 A. Taberna ...................................................................................................- 49 -

 B. Trapeza....................................................................................................- 51 -

 C. Alesco .....................................................................................................- 54 -

 D. Pretsl ......................................................................................................- 56 -

 E. Soloso......................................................................................................- 58 -

 F. RDF.........................................................................................................- 60 -

VI. CAUSES OF ACTION ........................................................................................- 62 -

ii

RIVERSIDE NATIONAL BANK OF FLORIDA, by its attorneys, Cohen Milstein Sellers & Toll, PLLC, alleges for its complaint:

## I.

## <u>INTRODUCTION</u>

1.      Plaintiff Riverside National Bank of Florida ("Riverside," the "Bank" or "Plaintiff") brings this action asserting claims under common law fraud, negligent misrepresentation, breach of fiduciary duty and breach of contract arising from its purchase of more than $211 million of purportedly high "investment grade" collateralized debt obligations ("CDOs") between 2005 and 2007.  The CDOs were all long term (*i.e.,* 30 year) structured finance products where the investors' interest and principal payments were secured by a basket of trust preferred or capital securities issued by banks, thrifts, insurance companies, real estate investment trusts ("REITs") or a combination of the same (collectively, the "Collateral"). Of the 27 CDOs purchased by Riverside, two were composed primarily of trust preferred securities ("TruPS" or "TRUPS") issued by banks and/or thrifts[1] ("Bank CDOs"); four were composed of TruPS or capital securities issued by insurance companies[2] ("Insurance CDOs"); three were composed primarily of TruPS issued by REITs[3] ("REIT CDOs"), and; eighteen were composed primarily of TruPS or capital securities issued by a combination of banks, thrifts and insurance companies.[4] ("Hybrid CDOs").   The CDOs were all sold to Riverside based on inflated

---

[1]      Soloso Bank Trust Preferred CDO 2005-1, Ltd. ("Soloso 2005-1") and Regional Diversified Funding 2004-1, Ltd. ("RDF 2004-1").

[2]      I-Preferred Term Securities I, Ltd. ("I-Pretsl I"), I-Preferred Term Securities II, Ltd. ("I-Pretsl II"), I-Preferred Term Securities III, Ltd. ("I-Pretsl III"), I-Preferred Term Securities IV, Ltd. ("I-Pretsl IV").

[3]      Taberna Preferred Funding II, Ltd. ("Taberna II"), Taberna Preferred Funding IV, Ltd. ("Taberna IV"), Taberna Preferred Funding V, Ltd. ("Taberna V").

[4]      Preferred Term Securities VIII, Ltd. ("Pretsl VIII"), Preferred Term Securities IV Ltd ("Pretsl IV"), Preferred Term Securities VI, Ltd. ("Pretsl VI"), Preferred Term Securities XV, Ltd. ("Pretsl XV"), Preferred Term Securities

investment grade ratings, ¶¶3-4, 6, 8, 10, 40-43, 67-71, 114, 119, 126, 130, 140, 143, 152, 156, 160, 165, 173, 177, 185, 213, 216-17; undisclosed material conflicts of interest, ¶¶46-49, 76-105, 114-18, 126-27, 139-40, 152-53, 160, 172-74, 185-86 and other material misrepresentations and omissions common in all of the offering materials.

2.      The action is brought against three Nationally Recognized Statistical Rating Organizations ("NRSROs"), Defendants Fitch, Inc., ("Fitch"), Standard & Poor's ("S&P"), a division of McGraw-Hill Companies, Inc., and Moody's Investors Service, Inc. ("Moody's") (collectively, the "RA Defendants") who, as a result of undisclosed conflicts of interest fraudulently and/or negligently, assigned inflated "investment grade" ratings to the CDOs as set forth below, ¶¶14-16, 40-118; the asset or collateral managers, Trapeza Capital Management, LLC ("Trapeza"), Taberna Capital Management, LLC ("Taberna") and Cohen & Company Financial Management, LLC ("CCFM") (the "Managers") who, together with the Sellers, as defined below, fraudulently and/or negligently, prepared false and misleading Offering Circulars (the "Offering Circular" or "OC") and Marketing Books (the "Marketing Book" or "MB") (collectively the "Offering Materials") that were provided to and relied upon by Riverside in purchasing the CDOs, ¶¶17-19, 40-118; and the investment bank sellers of the CDOs: FTN Financial Capital Markets ("FTN"), Keefe Bruyette & Woods, Inc., ("KBW"), Merrill Lynch, Pierce, Fenner & Smith, Inc., ("Merrill"), Bear Stearns & Co., Inc ("BSC"), ABN Amro, Inc. ("ABN"), Cohen & Company ("Cohen"), Citigroup Global Markets ("Citigroup"), Credit Suisse Securities (USA) LLC ("CSUSA", SunTrust Robinson Humphrey ("SunTrust"), and J.P. Morgan

---

XIV, Ltd. ("Pretzel XIV"), Preferred Term Securities XVI, Ltd. ("Pretsl XVI"), Preferred Term Securities XXIV, Ltd. ("Pretsl XXIV"), Alesco Preferred Funding I, Ltd. ("Alesco I"), Alesco Preferred Funding II, Ltd. ("Alesco II") Alesco Preferred Funding XV, Ltd. ("Alesco XV"), Alesco Preferred Funding VII, Ltd. ("Alesco VII"), Alesco Preferred Funding IX, Ltd. ("Alesco IX"), Alesco Preferred Funding X, Ltd. ("Alesco X"), Alesco Preferred Funding XIII, Ltd. ("Alesco XIII"), Trapeza CDO IX, Ltd. ("Trapeza IX"), Trapeza CDO XI, Ltd. ("Trapeza XI"), Trapeza CDO X, Ltd. ("Trapeza X"), Trapeza Edge CDO, Ltd. ("Trapeza Edge").

Securities, Inc., ("JPMS") (collectively, the "Sellers" or "Investment Banks") who fraudulently and/or negligently, prepared false and misleading OCs and MBs relied upon by Riverside in connection with their purchases. ¶¶20-29, 40-118.

3.      As set forth below, governmental investigations in 2008 and 2009 revealed that the RA defendants had inflated their ratings of CDOs in the period 2005 through 2007 in order to serve the financial interests of the investment banks who paid them.  For example, internal rating agency documents, produced to the U.S. House of Representatives' Committee on Oversight and Government Reform ("House Oversight Committee"), made clear that the RA Defendants knew of the inadequacy of their own rating CDO models. One S&P analyst commented to a colleague that the "[r]ating agencies continue to create an even bigger monster, the CDO monster.  *Let's all hope that we are all wealthy and retired by the time this house of cards falters.*" ¶¶87-89. Another S&P analyst stated "we rate every [CDO] deal.  It could be structured by cows and we would rate it."  ¶95.  Further, a former Moody's Managing Directors testified at the 2008 House Oversight Committee Hearing that "Moody's knew there were problems with the model and withheld that information because they didn't want to move off of the triple-A…. It meets the normal definition of fraud, exactly."  ¶90.  Another former Managing Director testified that "the focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and focused on "maximizing revenues at the expense of ratings quality." *Id.*  Yet another former Moody's Managing Director testified before the Oversight Committee as recently as September, 2009, confirming that Moody's was propelled by profit and revenue to deploy CDO models which were knowingly "unvalidated" and "haphazard". ¶¶102-05.

4.      The January 2009 Congressional Oversight Panel Report ("2009 COP Report") also found that the RA Defendants used outdated CDO ratings models in order to assign inflated ratings to CDOs and that this was done due to undisclosed conflicts of interest.  ¶¶98-101.

5.      The governmental investigations also included an investigation by the Securities and Exchange Commission ("SEC") which led to a July 2008 Report on Rating Agency practices between 2005 and 2007 (the "July 2008 SEC Report"). The July 2008 SEC Report revealed that undisclosed conflicts of interest infected the very manner in which the CDOs were created. ¶¶76-83.  The July 2008 Report revealed that the RA Defendants served as both undisclosed "coach" and "referee" in the creation of CDOs.  The Rating Agencies directly participated in structuring the CDO deals, determining the level of credit enhancements and other aspects of the CDO as part of the services they provided *gratis* before they were engaged to rate the deal. Testimony before the House Oversight Committee also revealed that the Sellers engaged the RA Defendants by way of "ratings shopping" whereby the RA Defendants would compete for the CDO engagement by offering the assigned ratings **before** they were engaged to rate the transaction.  ¶¶49, 84, 95-97, 100.

6.      As revealed, the investment bank Sellers, who engaged and paid the RA Defendants exploited the inherent conflicts of interest to ensure that the CDO ratings were inflated to meet the Sellers' desired profitability levels.  Assignment of the highest investment grade ratings to as many tranches of the CDO deals as possible was vital to the transactions' profitability.  The higher the rating assigned, the more attractive these CDOs were to investors like Riverside.  However, the inflation of the ratings was indiscernible to Riverside or any investor since the CDO ratings were built on, first and foremost, the undisclosed ratings of the underlying issuing institutions, primarily banks, insurance companies and REITs.  The "shadow

ratings" of the underlying institutions, as they were called, were considered confidential and only shared with the Sellers and Managers involved in the deal. The shadows ratings were an essential component in the overall rating of the CDOs, but were nevertheless withheld from investors. Nor were CDO investors, including Riverside, apprised of the underlying collateral in the CDO. In fact, 25 of the 27 CDOs purchased by Riverside never identified the underlying collateral at closing or at any time before Riverside made its purchases. ¶¶44-46, 123-25, 136-38, 149-51, 158-60, 169-71, 182-84. Only the RA Defendants, Sellers and Managers possessed this information. Further, 14 of the CDOs were "managed" CDOs, meaning the Managers were free to substitute new collateral in and out of the deal without disclosure to or consent of investors. *Id.* The only other parties privy to any information related to the underlying collateral securities were the RA Defendants who had to approve the substitution and the Sellers who continued to solicit investors. As a result, no matter how sophisticated an investor, it was only the RA Defendants, the Sellers and Managers who had actual knowledge of the underlying collateral assessments and the inflated CDO ratings.

7.     The inflation of the CDO ratings was further confirmed by the fact that shortly after issuance and sale of the CDOs to Riverside, the RA Defendants did not merely downgrade the CDOs, but rather announced fundamental corrections or "revisions" in the methodologies used originally to assign the CDOs high investment grade ratings in the first place. Moody's issued its corrected methodology in a report entitled "*Annual Sector Review: U.S. TRUP CDOs*" on April 13, 2009 and S&P issued its corrected methodology, entitled "*Global Methodology for Rating Trust Preferred Hybrid Securities Revised,*" on November 21, 2008. ¶¶56-59, 106-13. Fitch followed suit, issuing its own corrected methodology, entitled "*Fitch Revises Criteria for Reviewing U.S. CDOs Backed by Bank & Insurance TruPS*" on March 25, 2009. *Id.* These

corrections impacted the CDOs in one direction, by dramatically reducing their ratings. The uniform direction of the errors, leading toward inflation of the CDO ratings, established that the errors were not random, but rather designed to serve the financial interests of the RA defendants and the Sellers.

8.      The implementation of the corrected rating methodologies resulted in Riverside's CDOs collapsing in one fell swoop from investment grade to junk bond securities.   The magnitude of the CDOs' ratings collapse was unprecedented with the CDOs falling as many as 15 levels in each of the RA Defendants' 23 level rating systems. ¶¶63-66.

9.      The corrected rating methodologies revealed, at least in part, how the RA Defendants had inflated the ratings in the first place. The RA Defendants used methodologies that were premised on faulty and sham notions of "diversification" of the underlying CDO collateral. ¶¶33-34, 58-62.   For example, the rating methodologies credited such factors as "geographic diversity" of the issuing banks in rating the CDOs.   Further, ratings credit were assigned to the "diversity" existing where the collateral included securities issued by both banks and "thrifts" (also known as "Savings and Loans") subject to the Department of the Treasury's Office of Thrift Supervision.   Further, rating benefits were assigned to the "diversity" or lack of concentration of collateral in any one market, thereby assigning higher ratings to Hybrid CDOs that combined collateral which included banks, insurance companies and REITS, while failing to consider the common exposure to all these financial institutions to any broad economic downturn

10.      The Sellers and Managers themselves further destroyed any benefits of "diversification" by, unbeknownst to Riverside, engaging in widespread marketing the CDOs, or substantially similar CDOs, to the very same institutions that issued the TruPS serving as the CDOs' underlying collateral. ¶¶60-62.   As a result, when these CDOs suffered impairments,

these losses put pressure on the institutions own TRUP issues, thus adding more pressure on the CDOs and exposed these institutions to the same financial risks.  This risky sales practice was never disclosed to Riverside.

11.     The undisclosed conflicts of interest and inflated ratings assigned to the CDOs infected all of the Offering Materials that were prepared by both Sellers and Managers and were provided to, and relied upon by Riverside in making its CDO investments.  For example, the Offering Materials provided that the assignment of investment grade ratings were a condition to the issuance, yet these investment grade ratings were materially false and inflated in each instance. ¶¶119-20, 130-31, 143-44, 156-57, 165-66, 177-78.  Second, the Offering Materials falsely touted the various forms of beneficial "diversification" or limited "concentration" of the underlying collateral, including geographic and market diversity.  ¶¶121-22, 132-35, 145-48, 167-68, 179-81.  Third, the Offering Materials either warned potential investors of the "conflicts of interest" inherent in each transaction, but failed to disclose any conflicts of interests relating to the RA Defendants (disclosing only conflicts of interests between other parties such as between Sellers and Managers) or failed to disclose any conflicts of interest at all (*i.e.*, with respect to any of the parties to the CDO transaction).  ¶¶126-27, 139-40, 152-53, 160, 185-86, 172-74.  Fourth, the Offering Materials failed to disclose that the Sellers' and Managers' undisclosed sales methods, *i.e.,* selling the same and similar CDOs to the issuers of the underlying collateral, undermined the benefits of diversification touted in the Offering Documents. ¶¶122, 135, 148, 168, 181.

12.     As the impaired nature of the CDO collateral and undisclosed risks and conflicts of interests became known, the market value of Riverside's CDO collapsed.  The market value of

Riverside's CDOs plunged by 62%, or $140.6 million, from $211.86 million to $79.4 million. ¶¶71, 129, 142, 155, 164, 176, 188.

## II.

## PARTIES

13.    Plaintiff, Riverside National Bank of Florida ("Riverside," the "Bank" or "Plaintiff" as previously defined) is a Florida corporation with its principal place of business located at 1600 South Federal Highway, Fort Pierce, Florida, 34950.  Riverside was solicited by Defendants to purchase investment grade CDOs outside the State of New York and in the State of Florida.  Riverside relied on the Offering Materials generated by each Seller and, in particular, the investment grade rating assigned to each of the CDOs as described in the Offering Materials.

14.    Defendant The McGraw-Hill Companies, Inc. ("McGraw-Hill" as previously defined) is a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020, and several offices located in the state of California.  Standard & Poor's ("S&P," as previously defined), a division of McGraw-Hill, provides credit ratings, risk evaluation, investment research and data to investors.  S&P worked with the Managers and Sellers in forming and structuring the securitization transactions related to the CDOs, and then provided pre-conditioned credit ratings for the CDOs, as set forth in the Offering Materials.

15.    Defendant Moody's Investors Service, Inc. ("Moody's," as previously defined), a subsidiary of Moody's Corporation, provides credit ratings, risk evaluation, investment research and data to investors.  Moody's worked with the Managers and Sellers in forming and structuring the securitization transactions related to the CDOs, and then provided pre-conditioned credit ratings for the CDOs, as set forth in the Offering Materials.

16.     Defendant Fitch, Inc., ("Fitch," as previously defined) is a credit rating agency with its principal offices located at One State Street Plaza, New York, New York 10004.  Fitch performs financial research and analysis for commercial and governmental entities and holds a 10 percent share of the world's credit ratings market.  Fitch worked with the Managers and Sellers in forming and structuring the securitization transactions related to the CDOs, and then provided pre-conditioned credit ratings for the CDOs, as set forth in the Offering Materials. Fitch also "shadow rated" substantially all of the institutions that issued the TRUPS underlying the CDOs.

17.     Defendant Taberna Capital Management, LLC ("Taberna Capital") is a New York-registered limited liability company with its principal place of business located at 450 Park Avenue, New York, New York, 10022. Taberna Capital served as the Collateral Manager for the Taberna CDO Offerings.

18.     Defendant Cohen & Company Financial Management, LLC f/k/a Cohen Bros. Financial Management, LLC ("CCFM") is a Delaware-registered limited liability company with its principal place of business located at 405 Silverside Road, Wilmington Delaware, 19809. CCFM served as the collateral manager for the Alesco CDOs.

19.     Defendant Trapeza Capital Management, LLC ("Trapeza Capital") is an Ohio-registered limited liability company with its principal place of business at 441 Vine Street, Suite 507, Cincinnati, Ohio, 45202.  Trapeza Capital served as the Collateral Manager for the Trapeza CDOs. Trapeza Capital is a leading independent manager of trust preferred and subordinated debt securities issued by banks, thrifts, insurance companies, Real Estate Investment Trusts ("REITs") and Real Estate Operating Companies ("REOCs"). As of December 31, 2008, Trapeza and its affiliates managed $4.8 billion in CDOs and warehouse facilities.

20.     Defendant FTN Financial Capital Markets ("FTN") is principally located at 845 Crossover Lane, Suite 150, Memphis, Tennessee, 38117 and operates as a subsidiary of FTN Financial Group.  FTN was a major underwriter of CDOs in the period 2004-2007.  Together with Defendant Keefe, Bruyette and Woods, Inc., FTN sold and prepared the Offering Materials relating to the Pretsl and I-Pretsl CDOs.

21.     Defendant Keefe Bruyette & Woods, Inc. ("KBW") is a Delaware Corporation principally located at 787 Seventh Avenue, New York, New York, 10019.  KBW was a major underwriter of CDOs in the period 2004-2007.  KBW is a U.S. registered broker-dealer and, together with FTN, sold and prepared the Offering Materials relating to the Pretsl[5] and I-Pretsl CDOs.[6]

22.     Defendant Merrill Lynch, Pierce, Fenner & Smith. ("Merrill") is an international investment firm that provides investment banking services to business, engages in retail and institutional sales to its customers, and publishes research reports and ratings on stocks. Merrill's corporate headquarters were located at 4 World Financial Center, New York, New York 10080.  Merrill Lynch was a major underwriter of CDOs in the period 2004-2007.  In 2006, Merrill Lynch reported $1.73 billion in revenues from debt origination. Merrill Annual Report, February 26, 2007.  Merrill sold and prepared the Offering Materials relating to Alesco I, Alesco II, Alesco IX, Alesco VII, Alesco X, Taberna II and Taberna IV.

23.     Defendant JPMorgan Chase & Co. ("JPM") is an investment banking holding company incorporated in Delaware, and principally located at 270 Park Avenue, New York, New York 10017.  Pursuant to a Merger Agreement effective May 30, 2008, The Bear Stearns

---

[5]     The Pretsl CDOs include: Pretsl VI, Pretsl XIV, Pretsl XVI and Pretsl XXI.

[6]     The I-Pretsl CDOs include: I-Pretsl I, I-Pretsl II, I-Pretsl III and I-Pretsl IV.

Companies, Inc. ("BSI") merged with BSC Merger Corporation, a wholly-owned subsidiary of JPM, making BSI a wholly-owned subsidiary of JPM.  BSC sold and prepared the Offering Materials relating to Taberna V, Soloso 2005-1 and Alesco XIII.[7]

24.     Defendant SunTrust Robinson Humphrey ("SunTrust") is a subsidiary and the corporate and investment banking arm of SunTrust Banks, Inc.  SunTrust is principally located at 3333 Peachtree Road Northeast, Atlanta, Georgia, 30326.  According to its website, SunTrust provides comprehensive capital raising, strategic advisory, risk management, and investment solutions to serve the needs of corporate clients across the nation and offers fixed-income and equity research, sales and trading for institutional investors. SunTrust sold and prepared the Offering Materials relating to Soloso 2005-1.

25.     Defendant J.P. Morgan Securities, Inc. ("JPMS"), is the primary non-bank subsidiary of JPM engaging in investment banking activities in the US.  JPMS is principally located at 270 Park Ave. New York, NY 10017-2014.  Its services include debt and equity-underwriting, advice on mergers and acquisitions and restructuring, securities dealing and brokerage, and trade execution services, such as market making, equity derivatives, and structured investments, for institutional clients. The firm also offers a broad array of economic and equity research. J.P. Morgan Securities is a member of the New York Stock Exchange. JPMS was a major underwriter of CDOs in the period 2004-2007.  JPMS sold and prepared the Offering Materials relating to Trapeza X and Trapeza XI.

26.     Defendant Citigroup Global Markets, Inc. ("Citigroup") is a Delaware corporation with its principal place of business at 399 Park Avenue, New York, New York.  The Company is

---

[7]     BSC was an investment banking firm principally located at 383 Madison Avenue, New York, New York 10179. BSC was a major issuer of CDOs in the period 2004-2007.  In 2007, BSC reported $755 million in Asset-Backed Securities CDO-related exposure.

a multibank holding company providing various financial services to customers in the United States and internationally. Citigroup was a major underwriter of CDOs in the period 2004-2007. Citigroup sold and prepared the Offering Materials relating to RDF 2004-01.

27.     Defendant Credit Suisse Securities (USA) LLC ("CSUSA"), is located at 11 Madison Avenue, 7th Floor, New York, New York 10010. CSUSA is a Delaware corporation that delivers integrated investment banking and financial services throughout the United States. CSUSA is the parent and sole owner of Credit Suisse Securities (USA), LLC. CSUSA is an indirect and wholly owned subsidiary of CSG. CSUSA sold and prepared the Offering Materials relating to Trapeza IX and Trapeza Edge.

28.     Defendant ABN Amro, Inc. ("ABN"), is a bank holding company which performs commercial banking operations, investment banking and other related financial activities through its subsidiaries. Headquartered in the Netherlands, ABN is managed by a consortium of Fortis Investments ("Fortis"), Royal Bank of Scotland ("RBS") and Banco Santander (collectively, "RFS Holdings"). The Dutch government has since acquired Fortis' interests in ABN and continues managing ABN through RFS Holdings. ABN was a major underwriter of CDOs in the period 2004-2007. In 2006, ABN issued $83.8 billion of debt securities in the United States and Europe. *ABN Amro Holdings N.V. 2006 Annual Report*. With Cohen, ABN sold and prepared the Offering Materials relating to Alesco XV.

29.     Defendant Cohen & Company ("Cohen") is principally located at 2929 Arch Street, 17th Floor, Philadelphia, Pennsylvania, 19104. Together with ABN, Cohen sold and prepared the Offering Materials relating to Alesco XV.

## III.

## JURISDICTION & VENUE

30.     The Court possesses jurisdiction over this action pursuant to NYCPLR §§ 301 and 302(a).

31.     Venue is appropriate in New York County, New York because the Defendants maintain and/or conduct business in the County of New York and/or because the Defendants consented to the litigating in this venue.

## IV.

## FACTUAL ALLEGATIONS

### A.     Background

#### 1.     Collateralized Debt Obligations

32.     A collateralized debt obligation, or CDO, is a type of structured asset-backed security whose value and payments are derived from a portfolio of fixed-income underlying assets, including bonds, or other securities.  The CDO, issued by a Special Purpose Vehicle ("SPV"), generates a stream of cash flows in the form of interest payments, as well as a return of principal on the underlying collateral which is used to repay the notes issued to investors who purchased the CDO securities.  By purchasing CDO securities, the investor owns the right to participate in the cash flows from the underlying collateral owned by the SPV and managed by the Collateral Manager.

33.     One of the purported advantages of a CDO was that the underlying collateral provided diversity to hedge against industry and obligation specific risks.  Promoters claimed that the number of different bonds comprising the underlying collateral pool provided such

"diversification," that there was little default correlation among the bonds, and as such, contributed to the safety of the investment in the CDO.

34.     The CDOs sold to Riverside lacked any true diversity, however, since the underlying collateral was largely concentrated in three industries—banks, real estate and insurance—all of which were interrelated. The Sellers nevertheless promoted the CDOs as providing diversification in the Offering Materials.  For example, Alesco X's Offering Circular provides an explicit breakdown of the geographical or regional "diversification" of the underlying collateral securities. Alesco X OC, at 104-105.

35.     The CDOs were structured into different risk levels (or "tranches"), with the rights to cashflows of the lower-level tranches subordinated to the rights of the higher-level tranches. Although the subordinate tranches received higher interest rates, in the event of default or payment shortfalls, the subordinate tranches were the first to suffer losses.  Investors who purchased notes from the higher tranches received a lower interest rate, but in return, purportedly received a higher degree of safety. In essence, the principal and interest that should be available to pay the lower tranches if the collateral performs as projected acts as "back-up" collateral for the higher tranches. This is referred to as "overcollateralization," which acts as a credit enhancement supporting the higher tranches. This structure allowed CDO issuers to sell notes that were AAA rated to investors seeking a high degree of safety and to sell notes that were rated below investment grade to investors seeking high returns.

### 2.     <u>Trust Preferred CDOs</u>

36.     The growth of bank TruPS emerged due to changes in rules relating to bank capitalization. On October 21, 1996, the Federal Reserve approved the inclusion of trust preferred securities in Tier 1 capital by bank holding companies. As a result, banks may issue

trust preferred securities to bolster their capital structure.  By December 23, 1999, there were $32 billion in bank issued TRUPS outstanding, and as of 2005, 800 banks had issued over $85 billion in TRUPS.  TRUPS are hybrid securities which are treated as debt for tax purposes, making interest payments tax deductible, but as equity for purposes of regulatory capital and credit ratings.  Under a Federal Reserve rule effective April 11, 2005, bank holding companies may include restricted core capital elements including TRUPS in their Tier 1 capital up to 25% of core capital element however goodwill less any associated deferred tax liability must be deducted in calculating the core capital base. The rule allows for the inclusion of TRUPS in Tier 2 capital which is not eligible for inclusion in Tier 1 capital.

### 3.   <u>REIT CDOs</u>

37.   REIT CDOs are backed by TRUPS and subordinated debt issued by Real Estate Investment Trusts. REIT TRUPS are an important source of funding for small to mid-sized unrated REITs which have had limited access to the capital markets. REITs purchase mortgage debt or real estate related assets for investment, package them as a CDO, and fund that CDO with the purchased mortgages or real estate assets. The debt securities are repaid through the preferred stock dividend distributions that the REIT pays the issuer's parent company, which in turn uses the funds to make payments on the TRUPS debt.  In 2005, the first year CDOs backed by REIT TRUPS hit the market, approximately $12 billion of the $159 billion in total cash CDO issuance were attributed to REIT CDOs.

### 4.   <u>Insurance CDOs</u>

38.   An insurance CDO is securitized by surplus notes, capital securities and TruPS issued by insurance holding companies.  Surplus notes, first securitized in 2002, are bond-like instruments issued by a mutual insurance company, which functions as a private company owned

by its policy holders. These securities are subordinated obligations, and fall at the very bottom of the operating insurance company's capital structure. Surplus notes are considered "debt-like" in that they pay a coupon and have a finite maturity.

39.     Insurance TruPS provide a funding source for small and mid-size insurance companies that would otherwise find issuing capital on their own too costly, as these companies do not have ready access to the capital markets. The securities in these pools are issued by a stand-alone Special Purpose Vehicle ("SPV") and are sold to investors.  The notes' proceeds are used to purchase the transaction's collateral, which consists of surplus notes and insurance trust-preferred securities. CDO tranches are usually sold directly to institutional investors under Rule 144A of the 1933 Securities Act, and proceeds are channeled back to insurance companies.

**B.     Material Misrepresentations and Omissions**

**1.     The Offering Material Provided That the CDOs Were Being Sold "On Condition" of Investment Grade Rating**

40.     Each of the CDOs' Offering Materials stated that the CDO tranches were issued "on condition" of investment grade ratings.  The more senior classes were considered more secure given the existence of subordinated classes acting as credit protection, and the most senior classes were assigned the highest "AAA" credit ratings.  The remaining senior classes received varying levels of investment grade ratings with the lowest class in the structure, the equity class, not being rated at all.

41.     The assessment of credit risk for the different tranches of CDOs was central to investors' investment decisions.  That assessment was always heavily, if not overwhelmingly, influenced by the credit ratings assigned to the CDO tranches by the RA Defendants due to superior knowledge and expertise.  Indeed, in the case of many CDOs backed by TRUPS collateral, investors were not privy to the composition of the underlying collateral pools. This

vital information, however, was provided to the RA Defendants.   As a result, the RA Defendants played a central role in determining the CDO value and influencing the decision to make the CDO investments.

42.     Given the fact that: a) Riverside had no access to the shadow ratings of the institutions issuing the trust preferred securities; b) Riverside were typically not given access to the specific names of the securities that composed the underlying collateral pool; and c) such collateral, in any case, was composed of unrated securities issued by mostly, if not entirely, non-public entities; investor due diligence was impracticable and precluded.

43.     While the ratings assigned to each of these classes facially appeared to satisfy the Offering Materials stated condition, they were in fact artificially inflated to satisfy the profit demands of the investment banks responsible for selling the CDOs.

> **2.     The Offering Circulars and Marketing Books Failed to Identify the CDO Collateral and Instead Employed the RA Defendants as Gatekeepers of Collateral "Eligibility"**

44.     The structure of a CDO allowed the Sellers to offer the securities to investors before they were fully backed by the underlying collateral of debt securities. The Offering Circulars and Marketing Books provided to investors did not identify the underlying collateral, but instead overwhelmingly relied on "eligibility criteria" and the stated rating-specific condition required before a security could be included as collateral.   These documents thus precluded investor due diligence.   Further, the Alesco, Trapeza and Taberna CDOs were all "managed" CDOs that permitted the Managers to add, remove and replace underlying collateral securities in the portfolio.   The only required approval was that of the RA Defendants, and not the investors who purchased the securities.   It was the responsibility of the RA Defendants to provide a check on the Managers ability to substitute collateral by determining whether the collateral satisfied the

stated eligibility criteria. As a result, it was the RA Defendants – as opposed to Riverside – who had knowledge of the collateral underlying the CDO investments.

45. Further, only two of the 27 CDOs purchased by Riverside actually disclosed the underlying collateral pool of debt securities as of the closing date. Of those two, Taberna IV was a managed CDO transaction, allowing for the substitution of collateral during the life of the CDO. As a result, any investor due diligence was entirely precluded.

| Security Name | Collateral Type | Collateral |
|---|---|---|
| I-PRETSL I | Insurance Holding Company Capital Securities | Unidentified |
| I-PRETSL II | Insurance Holding Company Capital Securities | Unidentified |
| I-PRETSL III | Insurance Holding Company Capital Securities | Unidentified |
| I-PRETSL IV | Insurance Holding Company Capital Securities | Unidentified |
| PRETSL XIV | Insurance and Bank Holding Company Capital Securities | Unidentified |
| PRETSL XV | Insurance and Bank Holding Company Capital Securities | Unidentified |
| PRETSL XVI | Insurance and Bank Holding Company Capital Securities | Unidentified |
| PRETSL XXIV | Insurance and Bank Holding Company Capital Securities | Unidentified |
| PRETSL XVI | Insurance and Bank Holding Company Capital Securities | Unidentified |
| PRETSL VI | Insurance and Bank Holding Company Capital Securities | Unidentified |
| Alesco I | Bank, Thrift and Insurance TruPS | Unidentified |
| Alesco II | Bank, Thrift and Insurance TruPS | Unidentified |
| Alesco VII | Bank, Thrift and Insurance TruPS | Unidentified |
| Alesco IX | Bank, Thrift and Insurance TruPS | Unidentified |
| Alesco X | Bank, Thrift and Insurance TruPS | Unidentified |
| Alesco XIII | Bank, Thrift and Insurance TruPS | Unidentified |
| Alesco XV | Bank, Thrift and Insurance TruPS | Unidentified |
| Taberna II | REIT TruPS and CMBS | Unidentified |
| Taberna IV | REIT TruPS and CMBS | Identified |
| Taberna V | REIT TruPS and CMBS | Unidentified |
| RDF 2004-01 | Bank and Thrift TruPS | Identified |
| Trapeza Edge | Bank and Insurance TruPS and Subordinated Debt | Unidentified |
| Trapeza IX | Bank and Insurance TruPS and Subordinated Debt | Unidentified |
| Trapeza X | Bank and Insurance TruPS and Subordinated Debt | Unidentified |
| Trapeza XI | Bank and Insurance TruPS and Subordinated Debt | Unidentified |
| Soloso 2005-1 | Bank and Thrift TruPS | Unidentified |

### 3. The Offering Materials Failed to Disclose the RA Defendants' Shadow Ratings of the CDO Collateral

46. As noted, the RA Defendants never disclosed to Riverside their internal ratings of the institutions issuing the TruPS that comprised the underlying collateral for the CDOs. Fitch was the only rating agency that, for compensation, provided to the Sellers and Managers a

shadow rating of the TRUP issuing institutions. The other RA Defendants did their own internal shadow rating of the issuing institutions, but not for separate compensation. In all events, none of the RA Defendants shared their shadow ratings with Riverside or any other investor.

### 4. The Offering Materials Failed to Disclose the RA Defendants' Conflicts of Interest

47.     The Offering Circular and Marketing Book of each CDO either included an extensive boilerplate recitation of potential the conflicts of interests that may result from the activities of the Collateral managers, the trustees, and the underwriters or were silent. *See generally*, Taberna II Marketing Book, at 34 and Taberna II OC, at 43-46. In either instance, the true material conflicts of interests pertaining to the RA Defendants were entirely omitted and never disclosed to Riverside.

48.     The Offering Materials recited potential conflicts of interest that included the investment activities of the collateral manager, ownership of varying investment interests by directors, officers and employees of the Sellers Managers and the potential that the Issuers or Sellers may have also underwritten the underlying securities.

49.     In reality, the RA Defendants were heavily invested in the ratings they provided and were surrounded by unchecked conflicts of interests. These conflicts of interest were detailed in a report released by the SEC in July 2008 (the "July 2008 SEC Report"), after a year-long investigation into the RA Defendants' activities relating to the issuance of CDOs from 2005 through 2007. The July 2008 SEC Report disclosed that the RA Defendants were typically engaged by way of "ratings shopping" whereby the RA Defendant that was ultimately engaged was the one which provided the most profitable rating to the investment bank in "bidding" for the engagement. The July 2008 SEC Report also explained that the RA Defendants were incentivized, due to the highly profitable nature of these CDO engagements and the

concentration of business in the hands of a relatively small group of investment banks, to not update their models lest they become unable to provide to the investment bank the most profitable credit enhancement and rating structure for the CDOs.

50.     Moreover, the conflicts of interest which "plagued" the relationship between CDO issuers, underwriters and the RA Defendants were further expounded upon in a report issued by the Congressional Oversight Panel ("COP") in January 2009 (the "January 2009 COP Report") which stated, in no uncertain terms, that the conflicts of interest arising out of the fee-based relationship between CDO Sellers and the RA Defendants.  The COP also found that the use of inadequate and incorrect ratings models played a key role in the catastrophic decline in the CDO market, resulting in billions of dollars of investor losses.

### 5.     The Offering Materials Failed to Disclose that the RA Defendants Served As Both "Coach" and "Referee"

51.     The RA Defendants did not merely rate CDOs purchased by Riverside, they were instrumental in their creation.  The RA Defendants were engaged to structure the CDO.  For example, the RA Defendants used their models to determine the amount of senior and junior classes required, determining the appropriate levels of credit support in order to assign the CDO tranches investment grade ratings.  S&P's proprietary model was called "CDO Evaluator." The model simulated the loss distribution and time to default of the assets in the underlying portfolio using random "Monte Carlo" methods and determines if in any of the simulations a loss trigger is breached.

52.     S&P used its CDO Evaluator to run simulations to establish the default level of each proposed pool of assets at each rating level.  The model uses default estimates based on the existing ratings of the assets.  For example, for a tranche to be rated AAA, S&P might require that it be able to withstand a default rate of 30% of the asset pool for a particular period of time,

assuming a level of defaults based on the ratings of those assets. The default rate for lower credit ratings would be correspondingly higher.  The model also incorporates assumptions about how much of the face value might be recovered after a default.

53.     The RA Defendants evaluated the tranches of a CDO using a mathematical algorithm based, in part, on a transaction's underlying documents.  First, they calculated the expected cash flows of the underlying assets over time.  Then they determined how those cash flows would be paid out to each tranche over time.  The equity, or most junior, tranche absorbed losses up to the first "attachment point."  Then the most junior mezzanine tranche absorbed losses up to the next attachment point, and so on.  The RA Defendants then gave a credit rating to each of the tranches (but usually not the equity tranche) based on assumptions about certain key variables, including expected default rates, recovery rates, and correlation rates among assets.

54.     This process employs sophisticated mathematical techniques.  For example, a rating agency might run 100,000 computer simulations to determine the number of times a breach would occur, that is, how often a particular tranche would lose value beyond a specified level.  The variable in this assessment is the number of breaches out of the 100,000 runs, not the magnitude of the breach or any qualitative analysis of the breach.  For example, for a typical five year CDO, S&P might establish a confidence interval for the AAA level of .284%, meaning that the particular tranche would be "breached" in 284 runs out of 100,000.

55.     This structuring role of the RA Defendants compromised the RA Defendants' ratings function since they effectively assumed the role of both "coach" and "referee."  Further, the role in structuring was not disclosed in any of the CDO Offering Materials and was concealed from investors.

**6.      The  Offering Materials Failed to Disclose Sellers and Managers' Sales
Scheme of Selling CDOs Back to Collateral Issuers Undermined
Diversification**

56.      The Offering Materials were also materially false and misleading since they failed

to disclose that the Sellers and Managers sold the CDOs to the very same companies that issued

the underlying collateral so and that this practice potentially and did in fact, undermine any

modicum of benefit with respect to the diversification of risk.

57.      On February 16, 2009, Moody's disclosed in its "Moody's Weekly Credit

Outlook" the increase in pressure on TRUP CDOs caused by a "Negative Feedback Loop."

Moody's stated:

> Many U.S, community and regional banks issued trust preferred securities
> (TRUPs) into TRUP CDOs from 2000 to 2007 Many of these same U.S
> community and regional banks were the predominant investors in the subordinate
> tranches of TRUP CDOs. Subordinate TRUP CDOs are showing significant
> deterioration and some interest deferrals. ***Banks holding subordinate TRUP
> CDOs have suffered impairments or have been forced to sell them at very
> distressed prices. These impairments or losses put pressure on these banks' own
> TRUPs issues, thus adding more pressure on TRUP CDOs.***
>
> As of February 6, 2009, 99 banks are deferring interest payment or have defaulted
> on trust preferred securities held in TRUP CDOs.  This accounts for slightly more
> than $3.6 billion (10%) of the assets backing these CDOs An additional $500
> million (1.5%) of other assets backing TRUP CDOs including trust preferred
> securities from Insurance companies and REITS, as well as other TRUP CDO
> tranches, are deferring or have defaulted We predict continuing bank deferrals and
> defaults over the next year.
>
> While we have taken rating action on many TRUP CDOs to date, future actions
> are expected as TRUP deferrals and defaults continue to occur. Ironically, some
> of these TRUP deferrals and defaults could be caused by impairment to banks that
> issued TRUPs to CDOs and then bought back subordinate TRUP CDOs.

Moody's Weekly Credit Outlook, February 16, 2009, at 9 (emphasis added).

C.      **The Correction of Erroneous CDO Ratings Methodologies
        Confirmed that the Ratings Were Inflated**

58.     Shortly after Riverside consummated its CDO purchases, the RA Defendants "revised" the "methodologies" used to rate Riverside's CDOs.  These "revisions" abandoned the ratings benefit based on purported "diversity."

59.     Described more fully in Section G.5, Moody's issued its corrected methodology in a report entitled "*Annual Sector Review: U.S. TRUP CDOs*" on April 13, 2009; S&P issued its corrected methodology entitled "*Global Methodology for Rating Trust Preferred Hybrid Securities Revised*" on November 21, 2008.  ¶¶106-13.  Fitch followed suit issuing its own corrected methodology entitled "*Fitch Revises Criteria for Reviewing U.S. CDOs Backed by Bank & Insurance TruPS*" on March 25, 2009.  *Id.*

60.     As described more fully below, the Offering Materials touted the diversification of the collateral as offering investors protection when in fact there was no meaningful diversification.  Instead, the CDOs all suffered from substantial concentration risk due to the fact that all of the collateral underlying the CDOs was concentrated in only a few industries which were all interrelated and tied to the performance of the financial industry as a whole.  For example, though bank issuers of TruPS collateral were geographically dispersed, they all engaged in the same high risk subprime lending practices often across state-lines.  As a result, the diversification between regional banks in, for instance Arizona and Florida, was of no import because both institutions engaged in the same subprime lending and speculative real estate development, often in the same geographic regions.

61.     Moody's' April 13, 2009 revision, for example, conceded the lack of "diversity" in TRUP CDOs.  In that report, Moody's stated, "our assumptions concerning default probabilities, events of default, recovery rates, and diversity must be tailored to the unique

- 23 -

characteristics of TRUPs. ***The assumptions regarding pool diversity are particularly important because TRUP CDOs are effectively single-industry transactions.***" Moody's Structured Finance Special Report: Annual Sector Review: US TRUP CDOs, April 13, 2009, at 1 (emphasis added).

62.     Moody's therefore acknowledged that by selling the CDOs to the same institutions that issued the underlying collateral, the Sellers and Managers had actively destroyed any true diversification designed to protect against credit risk , at the same time that they touted diversification in the Offering Materials.

**D.  The Collapse of the CDOs' Ratings From Investment Grade to Junk Bonds
Further Confirmed that the Ratings Were Inflated**

63.    The Rating Agencies rated the CDOs pursuant to the following twenty three (23) level rating system:

| Color code | Number | Definition | Moodys | S & P | Fitch |
|---|---|---|---|---|---|
| | | **Investment Grade** | | | |
| | 10.0 | US Treasuries | *** | *** | *** |
| | 9.5 | Prime, maximum safety | Aaa | AAA | AAA |
| | 9.0 | Very high grade/quality | Aa1 | AA+ | AA+ |
| | 8.5 | " | Aa2 | AA | AA |
| | 8.0 | " | Aa3 | AA- | AA- |
| | 7.5 | Upper medium quality | A1 | A+ | A+ |
| | 7.0 | " | A2 | A | A |
| | 6.5 | " | A3 | A- | A- |
| | 6.0 | Lower medium grade | Baa1 | BBB+ | BBB+ |
| | 5.5 | " | Baa2 | BBB | BBB |
| | 5.0 | " | Baa3 | BBB- | BBB- |
| Color code | Number | Definition | Moodys | S & P | Fitch |
| | | **Speculative grade** | | | |
| | 4.5 | Speculative | Ba1 | BB+ | BB+ |
| | 4.0 | " | Ba2 | BB | BB |
| | 3.5 | " | Ba3 | BB- | BB- |
| | 3.0 | Highly speculative | B1 | B+ | B+ |
| | 2.5 | " | B2 | B | B |
| | 2.0 | " | B3 | B- | B- |
| | 1.5 | Substantial risk | Caa1 | CCC+ | CCC+ |
| | 1.0 | In poor standing | Caa2 | CCC | CCC |
| | 0.5 | " | Caa3 | CCC- | CCC- |
| | 0.0 | Extremely speculative | Ca | CC | CC |
| | 0.0 | Maybe in or extremely close to default | C | C+,C,C- | C+,C,C- |
| | 0.0 | Default | | D | D |

64.    This same rating system was used by these firms to rate corporate and governmental debt.  In the words of a Moody's presentation (Moody's, 2004), "the comparability of these options holds regardless of the country of the issuer, his industry, asset class or type of fixed income debt."  An S&P document stated, "our ratings represent a uniform measure of credit quality globally and across all types of debt instruments."  In other words, an AAA-rated

securitized issue should exhibit the same degree of credit quality as an AAA-rated corporate bond or U.S. Treasuries.  Riverside thus reasonably expected the high investment grade ratings of its CDOs to be commensurate with the same high investment grade ratings assigned to governmental bonds.

65.     In the financial world, the downgrade of a corporate bond by even a single level in the 23 level system is considered a material financial event for investors.  However, the magnitude of the CDO ratings collapse was unprecedented for any security. Riverside's CDOs collapsed an average of 11 levels within the first four years of the CDO's life as set forth below:

| Security Name | Initial Rating | Current Rating | Levels Downgraded |
|---|---|---|---|
| Alesco I Class A-1 | AAA | BB+ | 10 |
| Alesco II Class A-1 | AAA | BBB+ | 7 |
| Alesco VII Class C-1 | A | CC | 14 |
| Alesco VII Class C-2 | A | CC | 14 |
| Alesco IX Class C-3 | A- | CC | 13 |
| Alesco X Class A-2A | AAA | Ba1 | 11 |
| Alesco X Class D-2 | BBB | CC | 12 |
| Alesco XIII Class A-2 | AAA | Ba1 | 11 |
| Alesco XIII Class D-2 | BBB | C | 12 |
| Alesco XV Class A-2 | AAA | Ba2 | 12 |
| Alesco XV Class B-1 | AA | Caa2 | 15 |
| I-Pretsl I Class B-1 | A | B+ | 8 |
| I-Pretsl II Class B-3 | A | B+ | 8 |
| I-Pretsl III Class B-2 | A | B- | 10 |
| I-Pretsl IV Class A-1 | AAA | BBB | 8 |
| Pretsl VI Class Mezz | A+ | CCC | 12 |
| Pretsl XIV Class A-2 | AAA | BB- | 12 |
| Pretsl XV Class A-2 | AAA | B- | 15 |
| Pretsl XVI Class A-1 | AAA | BB- | 12 |
| Pretsl XVI Class B | AA | B | 12 |
| Pretsl XXIV Class D | BBB | C | 12 |
| RDF 2004-01 Class B-2 | AAA | BB+ | 10 |
| Soloso 2005-1 Class A-3B | A | Ca | 13 |
| Taberna II Class C-2 | A | C | 15 |
| Taberna IV Class C-2 | A | BB+ | 8 |
| Taberna V Class A3-FV | A | C | 15 |
| Trapeza Edge Class A-2 | AAA | Ba1 | 10 |
| Trapeza IX Class B-2 | A- | Caa3 | 12 |
| Trapeza X Class D-2 | BBB | C | 12 |
| Trapeza XI Class E-1 | BBB | C | 12 |
| Trapeza XI Class E-2 | BBB | C | 12 |

66.     This ratings collapse underscored that the ratings were flawed from the outset. The ratings were supposed to be cycle-neutral so as to reflect probable default through varying economic periods. The ratings purported to represent expected default expectancies across time with the ups and downs of business cycles factored into the rating.  The sudden collapse of the CDO ratings evidences that the ratings were not in fact cycle neutral and were otherwise fundamentally flawed for the many reasons stated herein.

**E.     The Near Immediate Default and/or Deferral of CDOs Further Confirmed the Inflation of CDO Ratings**

67.     The CDOs Riverside purchased were long term debt securities with a duration, on average, in excess of 30 years.  Within three years of purchase, virtually all of collateral underlying Riverside's CDO purchases was in default or had deferred payments.  While one of the characteristics of certain TRUPS was the ability to defer interest payments, the rating agencies themselves construed such deferrals as a negative event in rating the CDOs; they considered a security in full default on the event of a single deferral.

68.     Overcollateralization and excess spread in a CDO theoretically protects investors from occasional defaults in the underlying collateral.  Each tranche of a CDO is required to maintain a minimum overcollateralization level or percentage which is gauged by overcollateralization tests ("OC Tests") that measure the ratio of the portfolio balance to the balance of the CDO's debt securities.   When an OC Test fails, (also known as triggered) excess spread is diverted from subordinate tranches, which is then considered deferred, and used to pay down the CDO's senior-most tranche until the CDO is back in compliance with the OC Test.

69.     As the following demonstrates, even though the CDOs called for interest and principal payments over 30 years, in many cases, defaults and deferments of underlying

collateral occurred within seven or eight months of Riverside's initial purchase and in all instances within 39 months of said purchases.

| Security Name | Settlement Date | Date of First Collateral Default or Deferral | Months Between Settlement and First Default/Deferral |
|---|---|---|---|
| Taberna II Class C-2 | June 28, 2005 | November 12, 2007 | 28 months |
| Taberna IV Class C-2 | December 23, 2005 | August 6, 2008 | 31 months |
| Taberna V Class A3-FV | March 29, 2006 | August 6, 2007 | 16 months |
| Trapeza Edge Class A-2 | October 31, 2007 | September 8, 2008 | 11 months |
| Trapeza IX Class B-2 | January 10, 2006 | November 7, 2008 | 34 months |
| Trapeza X Class D-2 | December 5, 2006 | July 30, 2007 | 7 months |
| Trapeza XI Class E-1 | November 8, 2006 | July 30, 2007 | 8 months |
| Trapeza XI Class E-2 | November 8, 2006 | July 30, 2007 | 8 months |
| Alesco I Class A-1 | September 18, 2007 | June 1, 2008 | 8 months |
| Alesco II Class A-1 | December 19, 2007 | June 1, 2008 | 6 months |
| Alesco VII Class C-1 | March 1, 2006 | July 28, 2007 | 18 months |
| Alesco VII Class C-2 | April 19, 2005 | July 28, 2007 | 27 months |
| Alesco X Class A-2A | March 15, 2006 | August 1, 2008 | 29 months |
| Alesco X Class D-2 | March 15, 2006 | August 1, 2008 | 29 months |
| Alesco Class A-2 | November 1, 2007 | May 23, 2008 | 7 months |
| Alesco XV Class A-2 | November 13, 2007 | August 1, 2008 | 9 months |
| Alesco XV Class B-1 | November 2, 2007 | June 1, 2008 | 7 months |
| I-Pretsl I Class B-1 | April 22, 2005 | March 11, 2008 | 35 months |
| I Pretsl I Class B-1 | March 29, 2005 | March 11, 2008 | 35 months |
| I Pretsl II Class B-3 | May 2, 2005 | May 22, 2008 | 35 months |
| I-Pretsl II Class B-3 | April 29, 2005 | May 22, 2008 | 37 months |
| I-Pretsl III Class B-2 | June 21, 2005 | August 7, 2008 | 38 months |
| I-Pretsl IV Class A-1 | October 10, 2007 | No Deferrals or Defaults | N/A |
| Pretsl VI Mezzanine | October 4, 2007 | No Deferrals or Defaults | N/A |
| Pretsl XVI Class A-1 | October 31, 2007 | August 1, 2008 | 10 months |
| Pretsl XVI Class B | October 12, 2007 | August 1, 2008 | 10 months |
| Pretsl XVI Class B | October 26, 2007 | August 1, 2008 | 10 months |
| Pretsl XIV Class A-2 | August 28, 2007 | June 1, 2008 | 10 months |
| Pretsl XV Class A-2 | August 28, 2007 | September 10, 2008 | 13 months |
| Pretsl XXIV Class D | December 14, 2006 | August 1, 2008 | 20 months |
| Soloso 2005-1 Class A-3B | August 24, 2005 | November 21, 2008 | 39 months |
| RDF 2004-01 Class B-2 | September 25, 2007 | August 1, 2008 | 11 months |

70.     Furthermore, more than 25% of the CDOs purchased by Riverside defaulted on interest payments that were owed to Riverside between 17 and 31 months after Riverside's purchases.

71.     The immediate failed performance of the CDO collateral due to undisclosed risks and conflicts of interests and collapse of the CDO's ratings due to the corrections of the

erroneous methodologies resulted in Riverside sustaining losses in excess of 62%, or approximately $140 million dollars of Riverside's total $211.86 million investment as follows:

| Security Name | Initial Rating | Current Rating | | Cost | Market Value | Total Loss |
|---|---|---|---|---|---|---|
| I-PRETSL I Class B-1 | A | B+ | (S&P) | $4,071,400.00 | $2,715,055.52 | ($1,356,344.48) |
| I-PRETSL I Class B-1 | A | B+ | (S&P) | $4,065,000.00 | $2,715,055.52 | ($1,349,944.48) |
| I-PRETSL II Class B-1 | A | B+ | (S&P) | $5,078,000.00 | $2,331,112.30 | ($3,505,240.64) |
| I-PRETSL II Class B-3 | A | B+ | (S&P) | $1,509,750.00 | $701,593.34 | ($808,156.66) |
| I-PRETSL III Class B-3 | A | B+ | (S&P) | $503,250.00 | $233,864.45 | ($269,385.55) |
| I-PRETSL III Class B-2 | A | B- | (S&P) | $1,000,000.00 | $428,900.00 | ($571,100.00 |
| I-PRETSL IV Class A-1 | AAA | BBB | (S&P) | $9,762,500.00 | $6,336,577.49 | ($3,425,922.51) |
| PRETSL XIV Class A-2 | AAA | BB- | (S&P) | $6,878,125.00 | $2,047,948.91 | ($4,830,176.09) |
| PRETSL XV Class A-2 | AAA | B- | (S&P) | $9,600,000.00 | $2,471,419.03 | ($7,128,580.97) |
| PRETSL XVI Class B | AA | B3 | (Moody's) | $7,620,187.50 | $4,156,888.77 | ($3,463,298.73) |
| PRETSL XVI Class A-1 | AAA | BB- | (S&P) | $4,786,741.90 | $1,699,207.20 | ($3,087,534.70) |
| PRETSL XXIV Class D | BBB | C | (Fitch) | $4,000,000.00 | $1,050,639.35 | ($2,949,360.65) |
| PRETSL XVI Class B | AA | B | (S&P) | $3,777,235.51 | $2,065,035.06 | ($1,712,200.45) |
| PRETSL VI Mezzanine | A | CCC | (Fitch) | $1,294,217.50 | $316,866.67 | ($977,350.83) |
| **Sub-Total** | | | | **$63,946,407.41** | **$29,270,163.61** | **($34,863,496.74)** |
| | | | | | | |
| Alesco I Class A-1 | AAA | BB+ | (S&P) | $10,014,020.77 | $4,123,393.90 | ($5,890,626.87) |
| Alesco II Class A-1 | AAA | BBB+ | (S&P) | $10,172,066.66 | $4,619,304.98 | ($5,552,761.68) |
| Alesco VII Class C-2 | A | CC | (Fitch) | $4,500,000.00 | $1,385,729.42 | ($3,114,270.58) |
| Alesco VII Class C-1 | AAA | CC | (Fitch) | $3,960,000.00 | $1,231,759.48 | ($2,728,240.52) |
| Alesco VII Class C-2 | A | CC | (Fitch) | $3,000,000.00 | $923,819.61 | ($2,076,180.39) |
| Alesco IX Class C-3 | A- | Ca | (Moody's) | $8,500,000.00 | $2,134,352.08 | ($6,365,647.92) |
| Alesco X Class D-2 | BBB | CC | (Fitch) | $7,500,000.00 | $2,739,133.02 | ($4,760,866.98) |
| Alesco X Class A-2A | BBB | C | (Fitch) | $2,325,000.00 | $1,504,015.83 | ($820,984.17) |
| Alesco XIII Class A-2 | AAA | Ba1 | (Moody's) | $6,527,500.00 | $3,826,141.41 | ($2,701,358.59) |
| Alesco XIII Class D-2 | BBB | C | (Fitch) | $3,000,000.00 | $849,135.45 | ($2,150,864.55) |
| Alesco XV Class B-1 | AA | Caa2 | (Moody's) | $4,725,000.00 | $2,205,069.95 | ($2,519,930.05) |
| Alesco XV Class A-2 | AAA | Ba2 | (Moody's) | $4,650,000.00 | $2,808,974.75 | ($1,841,025.25) |
| **Sub-Total** | | | | **$68,873,587.43** | **$28,350,829.88** | **($40,522,757.55)** |
| | | | | | | |
| Taberna II  Class C-2 | A | C | (Fitch) | $10,000,000.00 | $939,413.35 | ($9,060,586.65) |
| Taberna IV Class C-2 | A*- | C | (Fitch) | $10,000,000.00 | $1,470,223.03 | ($8,529,779.97) |
| Taberna V Class A3-FV | A | C | (Fitch) | $9,963,510.00 | $1,949,130.03 | ($8,014,379.33) |
| **Sub-Total** | | | | **$29,963,510.00** | **$4,358,767.05** | **($25,604,745.95)** |
| | | | | | | |
| RDF 2004-01 Class B-2 | AAA | BB+ | (S&P) | $9,972,019.45 | $5,168,305.23 | **($4,803,714.22)** |
| | | | | | | |
| Trapeza Edge Class A-2 | AAA | Ba1 | (Moody's) | $8,000,625.00 | $5,197,444.44 | ($2,803,180.56) |
| Trap IX Class B-2 | A- | Caa3 | (Moody's) | $10,000,000.00 | $3,326,371.30 | ($6,673,628.70) |
| Trapeza X Class D-2 | BBB | C | (Fitch) | $7,105,000.00 | $1,394,050.42 | ($5,710,949.58) |
| Trapeza XI Class E-2 | BBB | C | (Fitch) | $5,000,000.00 | $694,732.73 | ($4,305,267.27) |
| Trapeza XI Class E-1 | BBB | C | (Fitch) | $2,000,000.00 | $241,174.07 | ($1,758,825.93) |
| **Sub-Total** | | | | **$32,105,625.00** | **$10,853,772.96** | **($21,251,852.04)** |
| | | | | | | |
| Soloso 2005-1 Class A-3B | A | Ca | (Moody's) | $7,000,000.00 | $1,479,342.20 | **($5,520,657.80)** |
| | | | | | | |
| **Total CDO Investment** | | | | **$211,861,149.29** | **$79,481,180.93** | **($132,567,224.30)** |

**F.      Riverside Reasonably Relied on the Misrepresentations
and Omissions Contained in the Offering Materials**

72.     Riverside relied heavily on the special expertise and knowledge of the CDO market and structures of the RA Defendants and the Defendant Sellers and Managers in making their investments.  Riverside was solicited by Defendant Sellers outside the State of New York using false and misleading Offering Materials that, among other things, overwhelmingly relied on inflated investment grade credit ratings assigned by the RA Defendants who were presumed by Riverside to have the knowledge and independence to accurately provide an unbiased determination of each CDO's risk and probability of payments.  As a result, Riverside used the RA Defendants' assigned ratings as one of the benchmarks by which it measured all of its CDO investments.

1.      **Investment Policies**

73.     Riverside began investing heavily in CDO securities in 2005.  The day-to-day oversight of Riverside's investments was the responsibility of the Bank's Chief Financial Officer (the "CFO") and Treasurer (the "Treasurer"), who in turn, reported to Riverside's Board of Directors Finance Committee (the "Board Finance Committee") and the Bank Asset Liability Management Committee (the "ALM Committee").    The Board Finance Committee was responsible for strategic planning, budgeting, forecasting, financial reporting and the accounting and treasury management functions. The ALM Committee managed the Bank's investment liquidity and alternative funding (leverage) strategies.

74.     Riverside maintained a detailed investment and liquidity policy with the stated purpose of "managing the Bank's balance sheet structure so as to optimize net income" through "maintenance of asset quality, an appropriate mix of assets and liability, measurement and management of interest rate and liquidity risk and adequate levels of capital." *Riverside Bank*

*Investment and Liquidity Policy*, April 19, 2007, at 3 (the "2007 ILP"). Most importantly, all of Riverside's ILPs relied on credit ratings as the measure of investment quality and performance. According to the 2005 ILP, at the start of their investment in the CDO market, Riverside required that all "structured securities be rated BBB or better by Moody's or Standard & Poor's." 2005 ILP, at 9.   With regard to CDOs specifically, Riverside prohibited the purchase of non-investment grade tranches, and limited any single purchase of BBB rated CDOs to the lesser of $7.5 million or 5% of the CDO pool. *Id.*

75.     As the markets became more volatile in 2006 and 2007 and downgrades started to pile up, both the Board Finance and ALM Committees maintained a vigilant eye on the bank's investment portfolio.   Beginning in May 2007, Riverside began "trading up" its CDO investments by selling off its "BBB" and "A" rated holdings for what was believed to be more secure and less risky "AA" and "AAA" tranches.   As the December 20, 2007 Board Finance Committee meeting minutes stated: the treasurer "has been selling 'A' rated securities at no loss and buying 'AAA' at a substantial discount."

**G.     2008 Governmental Investigations Revealed RA Defendants'
         Undisclosed Conflicts of Interest; Use of Defective Models;
         and Sellers' CDO Rating Shopping Practices_____**

**1.     July 2008 SEC Report Discloses RA Defendants' Undisclosed
         Conflicts of Interest in Rating and Structuring CDOs_____**

76.     In July 2008, the Securities and Exchange Commission ("SEC") published a detailed report identifying issues that were revealed after a year-long examination of Fitch, Moody's and S&P. (Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies, Securities and Exchange Commission, July 2008 (the "July 2008 SEC Report").   The investigation commenced after "the rating agencies performance in rating structured finance products raised questions about the accuracy of their

credit ratings generally as well as the integrity of the ratings process as a whole." The SEC's examination covered the period of June 2004 through July 2008, and included the ratings of both MBS and CDOs.

77.     The examination uncovered substantial inadequacies in the RA Defendants' ability to staff the CDO transactions to accurately analyze the risk involved in the CDOs based on the underlying collateral and structure. As the volume and complexity of structured finance deals increased from 2002 through 2006, the rating agencies' staffing did not appear to match their percentage increases in deal volume. July 2008 SEC Report, at 10.

78.     The July 2008 SEC Report also uncovered that the RA Defendants used unpublished ratings criteria in the ratings of CDOs which further added to the lack of transparency in the RA Defendants' functions and the complete inability for investors to conduct any measure of due-diligence. As emails from analytical managers at one agency, disclosed in the SEC Report, revealed:

> [N]ot all our criteria is published. For example, we have no published criteria on hybrid deals, which doesn't mean that we have no criteria.
>
> A criteria officer in the Structured Finance Surveillance group noted "our published criteria as it currently stands is a bit too unwieldy and all over the map in terms of being current or comprehensive. It might be too much of a stretch to say that we're complying with it because our SF [structured finance] rating approach is inherently flexible and subjective, while much of our written criteria is detailed and prescriptive. Doing a complete inventory of our criteria and documenting all of the areas where it is out of date or inaccurate would appear to be a huge job - that would require far more man-hours than writing the principles-based articles.

July 2008 SEC Report, at 13.

79.     To make matters worse, the SEC Report found that the RA Defendants did not have specific policies or procedures to identify or address errors in their models or methodologies. July 2008 SEC Report, at 17. As a result the already flawed models were blindly

- 32 -

applied to CDO structures to determine "optimal" credit support and ratings without regard to flawed or inaccurate criteria that was considered as part of the models even though Riverside relied on these models to accurately assess the risk when they purchased their securities.

80.     The SEC Report also found that the RA Defendants constantly made "out of model adjustments" affecting the ratings assigned to a CDO without documenting the rationale for such an adjustment.   In some instances, the loss levels that were returned by the RA Defendants' quantitative models were not used, and different, more favorable, loss level were used instead.   Although approved by the RA Defendants, in many cases, the rating agencies did not have documentation explaining the rationale for the adjustments or deviations, making further analysis of the applied ratings difficult for investors and foreclosed the opportunity for investors due diligence.   July 2008 SEC Report, at 14.   In the same regard, the SEC report found that none of the examined ratings agencies maintained specific written procedures for ratings CDOs.   Instead, the RA Defendants used loose guidelines that were neither comprehensive nor did they address the significant aspects of the CDO ratings process.   As the SEC Report stated:

> ***The rationale for deviations from the model or out of model adjustments was not always documented in deal records.*** As a result, in its review of rating files, the Staff could not always reconstruct the process used to arrive at the rating and identify the factors that led to the ultimate rating.
>
> ***There was also a lack of documentation of committee actions and decisions.*** At one rating agency, the vote tallies of rating committee votes were rarely documented despite being a required item in the rating committee memorandum or addendum; in addition, numerous deal files failed to include the required addenda and/or included no documentation of the ratings surveillance process. At two of the rating agencies, there were failures to make or retain committee memos and/or minutes as well as failures to include certain relevant information in committee reports.

July 2008 SEC Report, at 19-20 (emphasis added).

81.    One of the most vital responsibilities of the RA Defendants was the ongoing surveillance of the CDOs. Investors relied on this ongoing surveillance to provide an independent assessment of the CDO's performance. However, as a result of the basic conflicts of interest discussed above and the lack of procedures to do so, the CDOs were not reexamined until it was too late and the value of the CDOs had plummeted. As the SEC Report noted,

> **Resources appear to have impacted the timeliness of surveillance efforts.** In an internal email at one firm, an analytical manager in the structured finance surveillance group noted: "I think the history has been to only re-review a deal under new assumptions/criteria when the deal is flagged for some performance reason. I do not know of a situation where there were wholesale changes to existing ratings when the primary group changed assumptions or even instituted new criteria. The two major reasons why we have taken the approach is (i) lack of sufficient personnel resources and (ii) not having the same models/information available for surveillance to relook [sic] at an existing deal with the new assumptions (i.e., no cash flow models for a number of assets)."
>
> At the same firm, internal email communications appear to reflect a concern that surveillance criteria used during part of review period were inadequate.
>
> ***There was poor documentation of the surveillance conducted.*** One rating agency could not provide documentation of the surveillance performed (copies of monthly periodic reports, exception reports and exception communications by the surveillance staff indicate awareness of this issue.[31] At this firm, the Staff was unable to assess the information generated by the surveillance group during the review period. Another rating agency did not run monthly "screener reports" required by its own procedures for three months during the review period. It stated that the entire vintage of high risk subprime RMBS and CDOs were under a targeted review for two of the months. As a result, the Staff could not assess the information generated by the rating agency's surveillance staff for those months.
>
> ***Lack of Surveillance Procedures.*** Two rating agencies do not have internal written procedures documenting the steps that their surveillance staff should undertake to monitor RMBS and CDOs.

July 2008 SEC Report, at 21-22 (emphasis added).

82.    The July 2008 SEC Report also identified significant issues with the RA Defendants' Conflicts of Interest Policies.  Most importantly, the conflicts associated with the "issuer-pays" model of ratings engagements.  Although SEC rules specify that it is a conflict of

interest for a registered ratings agency to be paid by issuers or underwriters to determine credit
ratings with respect to securities they issue or underwrite, the July 2008 SEC Report still found
that:

> While each rating agency has policies and procedures restricting analysts from
> participating in fee discussions with issuers, these policies still allowed key
> participants in the ratings process to participate in fee discussions.
>
> One rating agency allowed senior analytical managers to participate directly in fee
> discussions with issuers until early 2007 when it changed its policy.
>
> At another rating agency an analyst's immediate supervisor could engage in fee
> negotiations directly with issuers. The firm changed its procedure in October 2007
> so that analytical staff (including management) may no longer engage in fee
> discussions with issuers; only business development personnel may do so.
>
> One rating agency permits an analytical manager to participate in internal
> discussions regarding which considerations are appropriate for determining a fee
> for a particular rated entity.
>
> Only one rating agency actively monitors for compliance with its policy against
> analysts participating in fee discussions with issuers, and, as a result was able to
> detect and correct certain shortcomings in its process.

July 2008 SEC Report, at 24.

83.    Further, the RA Defendants were worried of losing market share when modifying
their ratings methodologies.  As a result, analysts allowed market share concerns to influence
ratings and ratings criteria:

> At one firm, internal communications appear to expose analytical staff to this
> conflict of interest by indicating concern or interest in market share when firm
> employees were discussing whether to make certain changes in ratings
> methodology. In particular, *employees discussed concerns about the firm's
> market share relative to other rating agencies, or losing deals to other rating
> agencies*. While there is no evidence that decisions about rating methodology or
> models were made based on attracting or losing market share, in most of these
> instances, it appears that rating agency employees who were responsible for
> obtaining ratings business (i.e., marketing personnel) would notify other
> employees, including those responsible for criteria development, about business
> concerns they had related to the criteria.

For instance, a senior analytical manager in the Structured Finance group wrote "I am trying to ascertain whether we can determine at this point if we will suffer any loss of business because of our decision [on assigning separate ratings to principal and interest] and if so, how much?" "*Essentially, [names of staff] ended up agreeing with your recommendations but the CDO team didn't agree with you because they believed it would negatively impact business.*"

In another example, after noting a change in a competitor's ratings methodology, an employee stated: *"[w]e are meeting with your group this week to discuss adjusting criteria for rating CDOs of real estate assets because of the ongoing threat of losing deals."* In another email, following a discussion of a competitor's market share, an employee of the same firm states that aspects of the firm's ratings methodology would have to be revisited to recapture market share from the competing rating agency.

Another rating agency reported to the Staff that *one of its foreign ratings surveillance committees had knowledge that the rating agency had issued ratings on almost a dozen securities using a model that contained an error. The rating agency reported to the Staff that, as a result, the committee was aware that the ratings were higher than they should have been. Nonetheless, the committee agreed to continue to maintain the ratings for several months, until the securities were downgraded for other reasons.* Members of the committee, all analysts or analytical managers, considered the rating agency's reputational interest in not making its error public, according to the rating agency.

July 2008 SEC Report, at 25-26 (emphasis added).

### 2.    October 2008 Testimony Before House Oversight Committee Details Defective CDO Ratings Models, Conflicts of Interest and Ratings Shopping

84.    On October 22, 2008, the United States House of Representatives Committee on Oversight and Government Reform (referred herein as the "House Oversight Committee") heard testimony from former executives of S&P, Moody's and Fitch regarding a wide-range of issues including the defective models employed by the RA Defendants to rate CDO deals, the wide-ranging conflicts of interests present throughout the credit rating system, and most importantly, the practice of ratings shopping as the primary conflict.

85.    As the Chairman of the Committee, Henry Waxman ("Waxman") stated, "[b]etween 2002 and 2007, Wall Street issued a flood of securities and collateralized debt

obligations backed by risky subprime loans. These new financial inventions were so complex that virtually no one really understood them. For investors, a triple-A rating became the stamp of approval that said this investment is safe. And for Wall Street's investment banks, a triple-A rating became the independent validation that turned a pool of risky home loans into a financial goldmine. The leading credit rating agencies grew rich rating mortgage-backed securities and CDOs. As this chart shows, total revenues for the three firms doubled from $3 billion in 2002 to over $6 billion in 2007. At Moody's, profits quadrupled between 2000 and 2007. In fact, Moody's had the highest profit margin of any company in the S&P 500 for five years in row. Unfortunately for investors, the triple-A ratings that proved so lucrative for the rating agencies soon evaporated. ***In their testimony today, the CEOs of Standard and Poor's, Moody's, and Fitch will tell us that 'virtually no one ... anticipated what is occurring.' But the documents the Committee obtained tell a different story. "*** October 2008 House Oversight Committee Hearing, Waxman Opening Statement, at 1 (emphasis added).

86.　　Not only were the RA Defendants' models based on outdated data but they were often constructed by people who were not familiar with the markets in the areas that they were rating, and, in some instances real estate investments were graded by analysts who never actually reviewed the investment and who merely relied upon ratings assigned by a competitor rating agency.

87.　　In one email exchange between analysts at S&P, obtained by the Committee, one employee wrote:

> Doesn't it make sense that a triple-B synthetic [CDO] would likely have a zero recovery in a triple-A scenario? If we ran the recovery model with the triple A recoveries, it stands to reason that the tranche would fail, since there would be lower recoveries and presumably a higher degree of defaults … Rating agencies continue to create an even bigger monster, the CDO monster. ***Let's all hope we are all wealthy and retired by the time this house of cards falters.***

Email from Chris Myers to Belinda Ghetti, December 15, 2006. U.S. House Committee on Oversight and Government Reform, October 22, 2008 (emphasis added).

88.     Another email exchange between Moody's executives – including Raymond McDaniel ("McDaniel"), the current Chairman and CEO of Moody's – summarized a conversation in which Maryam Muessel ("Muessel"), the Chief Investment Officer of Global CDOs at Fortis Investments, expressed grave concern regarding deficiencies in the ratings agencies work with respect to CDOs.   Muessel stated:

> "if you can't figure out the loss ahead of the fact, what's the use of using your ratings?"

> "'you have legitimized these things', and are 'leading people into dangerous risk.'"

> "if the ratings are b.s., the only use in ratings is comparing b.s. relative to more b.s."

> "luckily I avoided Moody's ratings, didn't buy into your ratings, but 91 sucker managers did and were punished yesterday."

Email from Mary Lovatt to Mark McKenna, July 12, 2007, House Oversight Committee Hearing Transcript, October 22, 2008.

89.     Moreover, the ratings agencies executives' own testimony further revealed the extent to which the ratings agencies were at fault for the financial turmoil.  The Committee heard testimony from Frank Raiter (the "Raiter Testimony"), the former Managing Director and head of RMBS at S&P from March 1995 through April 2005, during which Raiter testified that the ratings on S&P CDO deals turn predominantly on the models and correlation index S&P employed, stating, in part:

> ***What I have read about [the CDO model used] is it's tremendously driven by this diversity index that is supposed to tell you whether bonds that are put in one of those transactions are correlated***, so if one sector of the market starts to go down, whether that might haven an impact on the performance of other bonds.  As they started, in my opinion, putting more residential mortgage and consumer

bonds in these transactions, they were highly correlated in our intuition.  We weren't working on it, but it was highly correlated.  ***It really amazed us that they could put so many mortgages in the pool and still believe that it had diversification risk***.

House Oversight Committee Hearing Transcript, at 34 (emphasis added).

90.     The Committee also heard testimony from Sean Egan ("Egan") Chairman of Egan-Jones Ratings Company.  In one exchange between members of the committee, Raiter and Egan, Egan explicitly acknowledged that fraud and omissions were directly involved in the inflated ratings assigned to the CDOs.

Mr. RAITER. I don't believe they didn't have the information. I believe it was available on both the residential side and on the CDO side. I believe there was a breakdown in the analytics that they relied on- And that the house of cards, intuitively, to a 1ot of us analysts that were outside the CDO area but were looking at it through the glass, intuitively, it didn't make a whole lot of sense.

And as Mr. Egan has suggested, we are all relatively well educated and intelligent people; and if you couldn't explain it to us, we were real curious how this product was enjoying such a tremendous success. And, unfortunately, anecdotally, we were told that it was enjoying a 1ot of success because they were selling these bonds in Europe and Asia and not in the United States, particularly the lower-rated pieces.

Committee Member CUMMINGS. It sounds like Mr. Egan and you and perhaps Mr. Fons believe, as Nobel Prize winner, Mr. Krugman, believes, is that there may have been some fraud here –

Mr. RAITER. Wel1, I wouldn't use fraud, sir. I would suggest that there became a tremendous disconnect between the business managers at our firm that were trying to maximize McGraw Hill's share price –

Committee Member CUMMINGS. Clearly, would you agree there was greed?

Mr. EGAN. I think that there was. Look at the definition of fraud. Then you have--when you hurt somebody and you do it willfully, then it is fraud.

And in the case--I am relying on the information provided by the Financial Times, Moody's knew there was problems with the model and withheld that information because they didn't want to move off of the triple-A. They hurt investors in the process. They knew they were hurting investors if the information in the Financial Times report was accurate. So, Yes.

Another comment on fraud.

Committee Member CUMMINGS. Yes, what?

Mr. EGAN. It meets the normal definition of fraud, exactly. You have to do some additional investigation, but if the Financial Times is right, yes, there is fraud.

Also, in terms of fraud in the underlying securities, I stated in connection with the Enron and WorldCom hearing that there's always fraud connected with financial matters where people--where firms are failing. It is normal. Okay? It is normal for the WorldCom executives to say everything is fine, don't worry about it. But yet it is the job of the credit rating firm to assess that and to get to the truth.

And that's where the alignment of interests is absolutely critical. If you don't have that, you have a breakdown in the system; and that is exactly what we have right now.

House Oversight Committee Hearing Transcript, at 55-56.

91.     The Oversight Committee also heard testimony from Jerome S. Fons ("Fons"). Fons had been an Executive at Moody's for 17 years, in various positions including Managing Director of Credit Policy.   Fons testified that due to profit concerns, a loosening of ratings standards took place at his company: "[T]he focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.

92.     Fons explained that the originators of structured securities were free to shop around for the ratings agency that would give them the highest rating and **"*typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality*."** Fons Testimony, at 3 (emphasis added).  Fons noted that the ratings agencies' "drive to maintain or expand market share made [them] willing participants in this [ratings] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another."  *Id.*  Fons said it was this business model that **"*prevented analysts from putting investor interests first*."**  *Id.* (emphasis added)

93.     McDaniel, Moody's' CEO, further acknowledged the degradation of ratings standards.  In the same confidential presentation to Moody's Board of Directors in October 2007, cited *supra*, McDaniel told the Board: "The real problem is not that the market ... underweights ratings quality but rather that in some sectors, it actually penalizes quality…   It turns out that ***ratings quality has surprisingly few friends***." *Id.* (emphasis added) He noted the pressure exerted on analysts to come up with high ratings, explaining "[a]nalysts and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "***we 'drink the kool-aid***.'" *Id.* (emphasis added).  In fact, *The Wall Street Journal,* in an article published on April 24, 2007, found that in at least one instance, Moody's increased the proportion of AAA ratings within a mortgage after its client complained and said it might go with a different ratings agency.

94.     The loosening of ratings standards is exemplified by the following "instant message" conversation between Rahul Shah ("Shah") and Shannon Mooney ("Mooney"), two S&P analysts, from April 5, 2007, that described S&P's rating of an investment similar to the Trusts and that was submitted during the House Oversight Committee Hearing:

**Shah:** btw – that deal is ridiculous

**Mooney:** i know right ... model def does not capture half of the rish [sic]

**Mooney:** *risk*

**Shah:** we should not be rating it

**Mooney:** we rate every deal

**Mooney:** it could be structured by cows and we would rate it

**Shah:** but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member.

95.     The ratings agencies executives also explicitly discussed the practice of ratings shopping as the primary conflict in the credit rating system.  As Fons' testimony stated,

> ***My view is that a large part of the blame can be placed on the inherent conflicts of interest found in the issuer-pays business model and rating shopping by issuers of structured securities.***  A drive to maintain or expand market share made the rating agencies willing participants in this shopping spree.  It was also relatively easy for the major banks to play the agencies off one another because of the opacity of the structured transactions and the high potential fees earned by the winning agency.  Originators of structured securities typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality.  While the methods used to rate structured securities have rightly come under fire, in my opinion, the business model prevented analysts from putting investor interests first.

Fons Testimony, at 3 (emphasis added).

96.     In further testimony by Sean J. Egan before the House Oversight Committee ("Egan Testimony"), Mr. Egan stated, in part:

> Assigning ratings on structured finance bonds differs from the process for corporate and municipal bonds.  In the unsecured corporate and municipal markets, debt issuers are subject to being rated by all of the rating agencies because financial information is publicly available to all parties.  The structured finance market has been a "rating by request" market where the debt issuers invite some or all of the major rating agencies to preview the collateral pools so the rating agencies can provide preliminary rating indications that can be used to size the bond classes and structure the bond transactions.
>
> ***Historically, all of the rating agencies have agreed to bow out of the rating process if they are not actually selected by the debt issuer to rate a securities transaction.  This has encouraged the debt issuers to shop for the best ratings so they can optimize their securitization proceeds.***

Egan Testimony, at 9 (emphasis added).

97.     With respect to the problem of ratings shopping, Mr. Egan further stated:

> But I think there is a deeper problem, and the deeper problem is addressing the question why is there ratings shopping? How can issuers go from one firm to the other firm to the other firm and get the highest rating and there is relatively 1ittle downside for the rating firm because they have the freedom of speech defense? I think you have to step back and say, how do we fix this? And I think you fix it from the institutional- investor standpoint, which will trickle down to the

individual. The institutional investor should know darned well that these ratings are paid for by the issuers. Why in the world do they have all their investment guidelines geared to conflicted ratings? They should make the adjustment, because it is a fool's error to try and rein in the activities of S&P and Moody's. It won't happen over the long term, because there is a natural tendency to serve their masters, the issuers.

Egan Testimony, transcript at 58.

### 3.    2009 Congressional Oversight Panel Report

98.    In January 2009, the Congressional Oversight Panel issued its own report on regulatory reform titled, "Modernizing the American Financial Regulatory System: Recommendations for Improving Oversight, Protecting Consumers and Ensuring Stability" (the "January 2009 COP Report" as previously defined).  The 2009 COP Report described several of the reasons for the financial meltdown, namely, the ineffective credit rating system was plagued with conflicts of interest.

99.    The January 2009 COP Report acknowledged that the investment grade ratings assigned to CDOs were vital to their success and it was these very ratings that investors relied on in making CDO investment decisions:

high ratings for structured financial products – especially … collateralized debt obligations (CDO), and CDOs that invested in other CDOs (frequently referred to as CDO-squared, or CDO[2]) – were essential for ensuring broad demand for these products. High ratings not only instilled confidence in potentially risk-averse investors, but also helped satisfy investors' regulatory requirements, which were often explicitly linked to ratings from the major credit rating agencies.

January 2009 COP Report, at 40.

100.    However, these ratings were tainted by the use of outdated models and the numerous significant conflicts of interest throughout the credit rating system.  As the January 2009 COP Report states,

Regarding conflicts of interests…although the practice of collecting payments from issuers has long provoked criticism, market observers often downplayed

these concerns, suggesting that "the agencies have an overriding incentive to maintain a reputation for high-quality, accurate ratings." Others, however, claim that the "issuer pays" model biases ratings upward and also encourages "ratings shopping" by issuers, which in turn provokes a race to the bottom on the part of the rating agencies, each willing to lower quality standards to drum up more business.

January 2009 COP Report, at 41.

101.    The January 2009 COP Report also acknowledged that the outdated models used by the ratings agencies involved "excessively rosy assumptions about the quality of the underlying" collateral and may have "involved mistaken assumptions about the independence of the underlying" collateral – including the assumption that defaults would not be highly correlated across a broad bundle" of securities.  January 2009 COP Report, at 42.

### 4.    2009 Congressional Testimony By Former Moody's Managing Director Again Attacks Moody's CDOs Rating Methodology

102.    On September 30, 2009, the House Oversight Committee again held hearings on "Credit Rating Agencies and the Next Financial Crisis" (the 2009 Oversight Hearing").  In his opening statement Chairman Edolphus Towns stated that the Rating Agencies "play a powerful role in our economy and they played a ***starring*** role in the collapse of the financial system." Towns Opening Statement, U.S. House Committee on Oversight and Government Reform: Hearing on the Credit Rating Agencies and the Next Financial Crisis, September 30, 2009, at 1 (emphasis supplied).

103.    During the 2009 Oversight Hearing, the Oversight Committee heard from a former Moody's Managing Director who exposed the extent to which inadequate models, conflicts of interest and lack of independence, among other things, substantially contributed to the collapse of the CDO and the CDO market.

104.    The Committee heard testimony from Eric Kolchinsky ("Kolchinksy") a former Managing Director at Moody's' CDO group throughout 2007, who was suspended from Moody's as a result of warnings he had sent to the compliance group regarding what he believed to be securities violations in the rating of CDOs. During Kolchinsky's testimony, he testified that conflicts of interest involving the rating agency were primarily the cause of Moody's' rating failures and were entirely unmanaged with senior management favoring "revenue generation over ratings quality and willing to dismiss or silence those employees who disagree with these unwritten policies." Kolchinsky Testimony, at 1.

105.    Kolchinsky also confirmed that the existence of inadequate models used to rate the CDOs.  These models did not realistically or accurately effect the risks associated with the CDOs because they were the product of a revenue-driven business.  As he stated, "rating models are put together in a hap-hazard fashion and are not validated if doing so would jeopardize revenues." *Id.*

### 5.    RA Defendants' Corrections of Prior Erroneous CDO Rating Methodologies

106.    The disclosures regarding the RA Defendants conflicted activities and use of deficient models in rating CDOs led to each firm dramatically "revising their CDO methodologies" at the end of 2008 and in early 2009.  On April 13, 2009, Moody's described its revised methodologies to rating U.S. TRUP CDOs in a report titled "*Moody's Annual Sector Review: U.S. TRUP CDOs.*   On November 21, 2008, S&P issued its revised methodology in a report titled "*Global Methodology for Rating Trust Preferred Hybrid Securities Revised.*"   On December 16, 2008, Fitch issued its new methodology in a report it called "*Global Rating Criteria for Structured Finance CDO's*"  and followed that up with an additional announcement on March 25, 2009 called, "*Fitch Revises Criteria for Reviewing U.S. CDOs Backed by Bank &*

*Inurance TruPS*." These methodologies eradicated the ratings benefit previously assigned to CDOs for purported geographic or issuer diversity.

107.    The false benefit previously attributed to "diversity" in CDO collateral derived from the inclusion of both "thrifts" and "banks" as separate categories was also eliminated when the methodologies were corrected. On April 13, 2009, in Moody's' Annual Sector Review of U.S. TruP CDOs, Moody's recounted its methodology corrections.  First, Moody's effectively wiped out the arbitrary distinction between banks and thrifts as a form of diversification and protection against concentration risk stating, "[w]e collapsed banks and thrifts into a single category for correlation calculations and also raised the correlation between bank regions to 10%."  In the past, banks and thrifts were treated as separate categories.  However, business models of small community banks and thrifts were nearly identical.  Moody's also instituted the same corrections to its methodologies to deal with insurance TruP CDOs by collapsing the previous 12 product lines for insurance into five property and casualty regions, which are the same regions used for banks, and one life and health category.

108.    Additionally, Moody's raised the correlation between property and casualty issuers, life and health issuers, and bank issuers in different regions by 10%.  By raising the correlation rates, Moody's increased the required subordination for the more senior tranches, which, as stated below, led to massive downgrades of the CDOs.

109.    The corrections also reflected dramatic increases in assumed default rates and the level of credit protection provided by credit enhancements.  In the April 13, 2009 publication, Moody's also disclosed that it had effectively wiped out any and all benefits of existing overcollateralization protection, by increasing default probabilities of the bank TruPS by 130% over the historical norm.  Moody's also increased the modeled likelihood of interest deferral on

these bank TruPS, by increasing the pool-wide default probability by 125%, as well as increased the insurance issuers by the same percentage. Additionally, Moody's created new ratio calculations for screening banks which are close to default and proceeded to assigned to these banks severe default and recovery assumptions.  Inherent in these corrections, Moody's acknowledged that its previous models failed to accurately or properly account for the true risks associated with the CDOs underlying collateral.

110.  In its November 21, 2008 publication, S&P also announced its own sweeping methodology corrections including fundamental increases in the assumptions for the likelihood of payment deferrals as well as the basis for any ratings enhancement based on "diversification." The diversification enhancement was removed changing the different industry code classifications for insurance companies and REITs and increasing the correlation assumptions for financial intermediaries, insurance companies, and REITs, resulting in increased correlations across industries, again removing the basis for any "diversification" benefit.  Lastly, S&P changed deferral assumptions to presume default and an adverse impact on ratings.

111.  The original investment grade ratings also assumed benefits from the excess spread serving as credit enhancement.  When an OC Test fails, *i.e.*, triggered, excess spread is diverted from subordinate tranches, to pay down the principal of the senior classes of the transaction. The corrected methodologies recognized that the practical benefits of this cash diversion was very limited due to the severe reduction in available interest.

112.  In its March 23, 2009 press release, Fitch pointed out the largest and most glaring problem with its existing models and the implemented corrections.  In doing so, Fitch stated:

> "Fitch believes that the excess spread that ***was a meaningful component in previous rating analyses will not significantly benefit credit enhancement in the future as a result of the reduction in cash flow associated with increased bank default and payment deferral on bank TruPs*. *<u>The revised review criteria does</u>***

> *__not use cash flow analysis in the evaluation of the credit enhancement to the__*
> *__rated bonds.__* Instead, Fitch will evaluate the effect of excess spread that is
> redirected through structural features such as over-collateralization and interest
> coverage tests, optional principal distribution amounts (OPDA) and other turbo
> features on a qualitative basis when applicable."

*Id.* (emphasis added).

113.    As a result, Fitch acknowledge that they had poorly modeled this dynamic, which in reality had given substantially less benefit to the CDO than the model previously had calculated.   By removing this assumption from the corrected model, Fitch's evaluation of outstanding CDOs, including Riverside's purchases, resulted in substantial downgrades as described below.

**6.    The Sellers and RA Defendants were Incentivized to Inflate CDO Ratings**

114.    Defendant Sellers required investment grade ratings in order to profitably market and sell the CDOs.  Investment grade ratings were an absolute perquisite to the Sellers sale of the CDOs.

115.    The RA Defendants were also highly motivated to provide inflated investment grade ratings. By comparison, for corporate debt, the fees charged by the RA Defendants were in the range of 3 to 4 basis points of the size of the issue, with minimum amounts in the range of $30,000 to $50,000 and maximum amounts in the range of $300,000.  For structured finance issues, fees ranged up to 10 basis points, with fees for complex transactions substantially higher, up to $2.4 million.   The RA Defendants were driven to inflate the CDO engagement not merely because such engagements provided greater profit margins, but also between 2005 and 2007 CDO deals were occurring at a high frequency and could be completed rapidly.   Indeed, structured finance growth became the principal driver of the RA Defendants' dramatic increase in revenue and income during this period.

116.     Moody's revenue increased from $538.6 million in 2004 to $886.7 million in 2006.   In 2005, structured finance accounted for $715 million, or 41% of Moody's' total revenue.   By 2006, Moody's had grossed $1.635 billion in total revenue from its ratings business with structured finance accounting for 54.2% of this total revenue.   According to Moody's 2006 Annual Report, collateralized debt and commercial mortgage-backed sectors contributed to about 96% of Moody's annual revenue increase.   Further structured finance revenue accounted for 43.5% of Moody's total revenue for 2006.

117.     Fitch revenue increased from $494.5 million in 2004 to $827.6 million in fiscal year 2007.   In 2005 and 2006, U.S. structured finance accounted for 51.9% of revenue.

118.     S&P revenue increased from $2.05 billion in 2004 to $2.75 billion in 2006.    In 2006, according to McGraw-Hill's Annual Report, the operating profit and margin of the Company's "structured finance" segment grew by 18.0% over the previous year.   McGraw Hill attributed this growth directly to the issuance of CDOs.   In 2005, McGraw-Hill's Credit Market Services, which included S&P had $1.73 million in revenue.   In 2006, that figure grew to $2.1 million, an increase of 19%.   The following year, in 2007, that figure grew again to $2.3 million, another 9.2% increase.

## V.

## CDO MISREPRESENTATIONS AND OMISSIONS AND THEIR EFFECT ON CDO RATINGS AND VALUE

### A.     Taberna

119.     Riverside Bank purchased a total of $29,563,510 of Taberna CDOs.   Taberna and Defendant Sellers jointly prepared the Offering Materials which stated that the CDOs were sold pursuant to a "condition"-specific rating.   *See* Taberna II OC, at 20.   *See also*, Taberna IV OC, at 13, Taberna V OC, at 15.

120.    These ratings were materially false since they were inflated for the reasons alleged herein.

121.    The Offering Documents also touted the diversity achieved by limiting concentration of the portfolio to any one issuer:

> Although on the Ramp-Up Completion Date no significant concentration with respect to any particular obligor in excess of an amount equal to 3.75% of the aggregate Principal Balance of all Collateral Debt Securities on the Ramp-Up Completion Date is expected to exist, the concentration of the portfolio in any one obligor would subject the Notes to a greater degree of risk with respect to collateral defaults by such obligor, and the **concentration of the portfolio in any one region** would subject the Notes to a greater degree of risk with respect to economic downturns relating to such region.

*Id.,* at 38 (emphasis added). *See also*, Taberna II OC, at 43, Taberna V OC, at 33.

122.    This statement was false and misleading because it all failed to disclose that: a) the purported "diversity" of the collateral had been erroneously used to inflate the ratings of the CDO; b) geographic diversity was not a meaningful positive factor particularly since there was little consideration of overlapping risks faced by geographically diverse banks; and that c) the Sellers and Managers had effectively undermined any benefit of diversification by selling the CDOs to the same institutions that issued the underlying collateral thereby exposing all of the collateral institutions to the same geographical and market risks.

123.    The Offering Materials also precluded investors from knowing the collateral securities, instead describing only the "eligibility criteria."  *See* Taberna II OC, at 18, 122; Taberna IV at 13; Taberna V OC, at 13-14, 93.

124.    Further, the RA Defendants, were described to have a gatekeeper function approving the inclusion of specific collateral securities, both at the beginning and in an ongoing basis for replacement collateral.  *See* Taberna II OC, at 41, 114, 122; Taberna IV at 96-97, 103; Taberna V OC, at 85-86, 93.

125.    These statements, ¶¶ 123-24, evidenced that the structure of the CDOs precluded meaningful due diligence of the underlying collateral as alleged herein.

126.    The Offering Materials also purported to disclose "conflicts of interest" relating to the Offerings in identical language. *See* Taberna II OC, at 155-56; Taberna IV OC, at 38-41; Taberna V OC, at 33-37.

127.    These statements were materially false and misleading since there was no disclosure of the conflicts of interests of the RA Defendants including: (a) the RA Defendants were engaged by way of rating shopping practices; b) the RA Defendants deployed inflated models to produce inflated ratings; c) the RA Defendants were not independent because they structured the CDOs as well as rated them; and that d) the same representatives who rated the CDOs also negotiated the RA Defendant fees or were aware of the RA Defendants profit interests in obtaining the engagement.

128.    On January 14, 2009, Fitch, applying its new methodology downgraded all of the Taberna CDOs to "C," one of its lowest ratings other than default, as stated in ¶71.

129.    As a result, the value of the Taberna CDOs have collapsed by 85.4% or $25,604,745.95. ¶71.

**B.    Trapeza**

130.    Riverside Bank purchased a total of $32,105,625.00 of Trapeza CDOs.  Trapeza, as collateral manager, and Defendant Sellers jointly prepared the Offering Materials all of which stated that the CDOs were sold pursuant to a "condition"-specific rating. *See* Trapeza X OC, at 17. *See also*, Trapeza IX OC, at 14, Trapeza XI OC, at 21, Trapeza Edge OC, at 14.

131.    These ratings were materially false since they were inflated for the reasons alleged herein.

132.    The Trapeza Offering Materials also touted the diversity of the underlying collateral debt securities, stating as part of the "portfolio limitations" that "Measurement of the degree of compliance with the Collateral Quality Tests will be required on the Closing Date and on the Ramp-Up Completion Date" Trapeza X OC, at 134. *See also*, Trapeza IX OC, at 113; Trapeza XI OC, at 152; Trapeza Edge OC, at 119.

133.    As part of the Collateral Quality Tests, the debt securities were required to satisfy the "Moody's Diversity Test," stating that "'[t]he Moody's Diversity Test' is a test that will be satisfied (i) on the Closing Date if the Diversity Score is equal to or greater than 14 on such date and (ii) on the Ramp-Up Completion Date if the Diversity Score is equal to or greater than 14 on such Date.  The "Diversity Score" is a measure of geographic diversity of obligors." Trapeza X OC, at 134 (using the "Moody's Asset Correlation Test" for the same purpose). *See also*, Trapeza Edge OC, at 119; Trapeza IX OC, at 113; Trapeza XI OC, at 152 (using the "Moody's Asset Correlation Test" for the same purpose).

134.    In explaining the need for such diversity requirements the Offering Documents stated:

> Several studies have demonstrated the existence of strong regional influences in the United States economy. … The Issuer expects the Collateral Debt Securities to be dispersed, to some degree, ***between all five Geographic Regions on the Ramp-Up Completion Date.***

Trapeza X OC, at 132 (emphasis added). *See also*, Trapeza Edge OC, at 117; Trapeza IX OC, at 112; Trapeza XI OC, at 150.

135.    The above statements, ¶¶132-34, were all false and misleading because they all failed to disclose that: a) the purported "diversity" of the collateral had been erroneously used to inflate the ratings of the CDO; b) geographic diversity was not a meaningful positive factor particularly since there was little consideration of overlapping risks faced by geographically

diverse banks; and that c) the Sellers and Managers had effectively undermined any benefit of diversification by selling the CDOs to the same institutions that issued the underlying collateral thereby exposing all of the collateral institutions to the same geographical and market risks.

136.   The Offering Materials also did not identify to the collateral securities, instead describing only the "eligibility criteria."  *See* Trapeza IX OC, at 116-119; Trapeza X OC, at 153-54; Trapeza XI OC, at 158-159; Trapeza Edge OC, at 121-25.

137.   Further, the RA Defendants were stated to have a gatekeeper function approving the inclusion of specific collateral securities, both at the beginning and in an ongoing basis for replacement collateral.  *See* Trapeza IX OC, at 120-122; Trapeza X OC, 126-127, 156; Trapeza XI OC, at 130, 160; Trapeza Edge OC, at 127.

138.   These statements, ¶¶136-39, evidenced that the structure of the CDOs precluded meaningful due diligence of the underlying collateral as alleged herein.

139.   The Offering Materials also purported to disclose "conflicts of interest" relating to the Offerings in identical language. *See* Trapeza IX Marketing Book, at 23; Trapeza IX OC, at 41-44, Trapeza X OC, at 55-58, 162; Trapeza XI OC, at 61-66; Trapeza Edge CDO, at 150.

140.   These statements were materially false and misleading since there was no disclosure of the conflicts of interests of the RA Defendants including that: a) the RA Defendants were engaged by way of ratings shopping practices; b) the RA Defendants deployed inflated models to produce inflated ratings; c) the RA Defendants were not independent because they structured the CDOs as well as rated them; and that d) the same representatives who rated the CDOs also negotiated the RA Defendant fees or were aware of the RA Defendants profit interests in obtaining the engagement.

141.    On April 9, 2009, Fitch downgraded the Trapeza CDOs to junk as stated in ¶71, above.

142.    As a result, the value of Riverside's Trapeza CDOs have collapsed by 66.2% or $21,251,852.04. ¶71.

**C.    Alesco**

143.    Riverside Bank purchased a total of $68,873,587.43 of Alesco CDOs.  Cohen, as Collateral Manager, and Defendant Sellers jointly prepared the Offering Materials all of which stated that the CDOs were sold pursuant to a "condition"-specific rating. *See* Alesco I OC, at 9. *See also*, Alesco II OC, at 9, Alesco VII OC, at 16, Alesco IX OC, at 17, Alesco X OC, at 17-18, Alesco XIII OC, at 16-17.

144.    These ratings were materially false since they were inflated for the reasons alleged herein.

145.    The Offering Materials touted the geographic diversity of the underlying collateral debt securities, stating as part of the "portfolio limitations" that "the Collateral Debt Securities [must] have satisfied diversity criteria established by Moody's and achieved a total diversity score of at least 16." Alesco I OC, at 73.  *See also*, Alesco II OC, at 77, Alesco VII OC, at 139; Alesco IX OC, at 146; Alesco XV OC, at 142-43 (using "Moody's Asset Correlation Test" for the same purposes).

146.    The Offering Materials explained in depth the different regions and the percentage of the underlying securities from each region. Alesco I OC, at 74-75.  *See also*, Alesco II OC, at 77-79; Alesco VII OC, at 112-15; Alesco IX OC, at 117-19; Alesco X OC, at 104-05; Alesco XV OC, at 114-16.

147.    In explaining the need for such diversity, the Offering Materials stated:

> [S]ignificant correlation has been identified between bank default rates and the geographical region in which defaulting banks are located, indicating that **diversification of a portfolio of bank debt among geographical regions may reduce the default risk profile of such a portfolio**. The total diversity score has been taken into account in structuring the portfolio of Collateral Debt Securities.

Alesco I OC, at 73 (emphasis added).  *See also*, Alesco II OC, at 77; Alesco VII OC at 139; Alesco IX OC, at 146; Alesco XV OC, at 143.

148.     The above statements, ¶¶145-47, were all false and misleading because they all failed to disclose that: a)  the purported "diversity" of the collateral had been erroneously used to inflate the ratings of the CDO; b) geographic diversity was not a meaningful positive factor particularly since there was little consideration of overlapping risks faced by geographically diverse banks; and that c) the Sellers and Managers had effectively undermined any benefit of diversification by selling the CDOs to the same institutions that issued the underlying collateral thereby exposing all of the collateral institutions to the same geographical and market risks.

149.     The Offering Materials did not disclose to investors the collateral securities, instead describing only the "eligibility criteria."  *See* Alesco I OC, at 71-73; Alesco II OC, at 75-77; Alesco VII OC, at 108-12; Alesco IX OC, at 113-17; Alesco X OC, at 99-103; Alesco XIII OC, at 100; Alesco XV OC, at 110-14.

150.     The RA Defendants were stated to have a gatekeeper function approving the inclusion of specific collateral securities, both at the beginning and in an ongoing basis for replacement collateral.  *See* Alesco I OC, at 98-99; Alesco II OC, at 97-98; Alesco VII OC, at 102-03; Alesco IX OC, at 107-08; Alesco X OC, at 134-37; Alesco XIII OC, at 93, 103; Alesco XV OC, at 102-03.

151.     These statements, ¶¶149-50, evidenced that the structure of the CDOs precluded meaningful due diligence of the underlying collateral as alleged herein.

152.    The Offering Materials also purported to disclose conflicts of interest relating to the Offerings in identical language. *See* Alesco I OC, at 75-77; Alesco II OC, at 27-29; Alesco VII OC, at 41-44; Alesco IX OC, at 42-45; Alesco X OC, at 38-41; Alesco XIII OC, at 38-41; Alesco XV OC, at 41-44.

153.    These statements were materially false and misleading since there was no disclosure of the conflicts of interests of the RA Defendants including: a) the RA Defendants were engaged by way of ratings shopping practices; b) the RA Defendants deployed inflated models to produce inflated ratings; c) the RA Defendants were not independent because they structured the CDOs as well as rated them; d) the same representatives who rated the CDOs also negotiated the RA Defendant fees or were aware of the RA Defendants profit interests in obtaining the engagement.

154.    Moody's, on March 27, 2009, and Fitch, on April 9, 2009, downgraded all of the Alesco CDOs substantially, many of them to junk bond levels as stated in ¶71.

155.    As a result, the value of the Alesco CDOs have collapsed by 59% or $40,522,757.55. ¶71.

**D.    Pretsl**

156.    Riverside Bank purchased a total of $58,868,407.41 of Pretsl CDOs.  Defendant Sellers prepared the Offering Materials all of which stated that the CDOs were sold pursuant to a "condition"-specific rating.  *See* Pretsl XV OC, at 16.  *See also*, Pretsl VI OC, at 12-13, Pretsl XIV OC, at 14, Pretsl XVI OC, at 18, Pretsl XXIV OC, at 16-17, I-Pretsl OC, at 17, I-Pretsl II OC, at 17, I-Pretsl III OC, at 17, I-Pretsl IV OC, at 20.

157.    These ratings were materially false since they were inflated for the reasons alleged herein.

158.    The Offering Materials did not disclose to investors the collateral securities, instead describing only the "eligibility criteria" that the collateral securities were subject to. *See* I-Pretsl I OC, at 57-59; I-Pretsl II OC, at 54; I-Pretsl III OC, at 56-58; I-Pretsl IV OC, at 61-65; Pretsl VI OC, at 37-39; Pretsl XIV OC, at 48-50; Pretsl XV OC, at 55-58; Pretsl XVI OC, at 60-62; Pretsl XXIV OC, at 59-62.

159.    These statements evidenced that the structure of the CDOs precluded meaningful due diligence of the underlying collateral as alleged herein.

160.    The Offering Materials failed to disclose any conflicts of interest involving any party involved with the issuance of the CDOs, not to mention conflicts associated with the RA Defendants.

161.    These omissions were false and misleading since there was no disclosure of the conflicts of interests involving the RA Defendants, including that: a) the RA Defendants were engaged by way of ratings shopping practices; b) the RA Defendants deployed inflated models to produce inflated ratings; c) the RA Defendants were not independent because they structured the CDOs as well as rated them; and that d) the same representatives who rated the CDOs also negotiated the RA Defendant fees or were aware of the RA Defendants profit interests in obtaining the engagement.

162.    The combined effect of collateral defaults and deferrals with the application of the revised methodologies (appropriately assessing CDO risk for the first time, including the truth behind these misstatements) had a devastating effect on the ratings and market value of the Pretsl CDOs.

163.    S&P on April 2, 2009, and Fitch, on April 9, 2009, downgraded all of the Pretsl CDOs purchased by Riverside substantially, many of them to junk bond levels as stated in ¶71.

164.     As a result, the value of the Pretsl CDOs have collapsed by 55% or $34,863,496.74. ¶71.

**E.**     **Soloso**

165.     Riverside Bank purchased $7,000,000 of Soloso CDOs.   Defendant Sellers prepared the Offering Materials, all of which stated that the CDOs were sold pursuant to a "condition" of the CDO receiving specific investment grade  ratings. *See* Soloso 2005-1 OC, at 16.

166.     These ratings were materially false since they were inflated for the reasons alleged herein.

167.     The Offering Materials touted the geographic diversity of the underlying collateral debt securities, stating as part of the "portfolio limitations" that:

> the Portfolio Collateral, in the aggregate, will have, on the Effective Date, a Moody's ***diversity score of not less than 17*** (the Moody's diversity score measures the concentration of the Portfolio Collateral in terms of Portfolio Collateral Issuers and geographical regions

Soloso 2005-1 OC, at 46 (emphasis added).

168.     The above statement was false and misleading because it failed to disclose that: a) the purported "diversity" of the collateral had been erroneously used to inflate the ratings of the CDO; b) the geographic diversity was not a meaningful positive factor particularly since there was little consideration of overlapping risks faced by geographically diverse banks; and that c) the Sellers and Managers had effectively undermined any benefit of diversification by selling the CDOs to the same institutions that issued the underlying collateral thereby exposing all of the collateral institutions to the same geographical and market risks.

169.     The Offering Materials did not disclose to investors the collateral securities, instead describing only the "eligibility criteria."  *See* Soloso 2005-1 OC, at 45-46.

170.    The RA Defendants were stated to have a gatekeeper function approving the inclusion of specific collateral securities, both at the beginning and in an ongoing basis for replacement collateral.  *See* Soloso 2005-1 OC, at 46.

171.    These statements, ¶¶169-70, evidenced that the structure of the CDOs precluded meaningful due diligence of the underlying collateral as alleged herein.

172.    The Soloso Offering Materials purported to disclose conflicts of interest relating to the Offerings. *See* Soloso 2005-1 Marketing Book, at 45-46, Soloso 2005-1 OC, at 23.  The Marketing Book stated that "various potential and actual conflicts of interest may exist with respect to Bear Stearns & Co, Inc., and SunTrust Capital Markets, Inc as described in the Confidential Offering Circular. The Issuer will acquire the Portfolio Collateral in transactions in which Bear Stearns, SunTrust Capital Markets, Inc., or any other entity engaged in the placement of the CDO Securities is acting as a broker, dealer or placement agent and earning a fee or commission with such transactions."  Soloso 2005-1 Marketing Book, at 45.

173.    Further, the Offering Circular, in listing examples of these conflicts of interest, stated only that "conflicts of interest may arise from the overall business and investment activities of any of the Initial Purchasers, their Affiliates and their respective clients, which include Portfolio Collateral Issuers and their Affiliates."  However, in listing these examples, the Offering Circular makes no mention of the Issuer and Underwriters' interaction with the RA Defendants nor do they refer at all to the conflicts of interest resulting from the RA Defendants role in the structuring, marketing or rating of the CDOs.  (*See* Soloso 2005-1 OC, at 23.)

174.    These statements, ¶¶172-73, were materially false and misleading since there was no disclosure of the conflicts of interests of the RA Defendants including that: a) the RA Defendants were engaged by way of ratings shopping practices; b) the RA Defendants deployed

inflated models to produce inflated ratings; c) the RA Defendants were not independent because they structured the CDOs as well as rated them; and that d) the same representatives who rated the CDOs also negotiated the RA Defendant fees or were aware of the RA Defendants profit interests in obtaining the engagement.

175.    Moody's, on November 28, 2008, and Fitch, on April 9, 2009, as stated in ¶71, downgraded the Soloso CDO to junk bond levels.

176.    As a result, the value of the Soloso CDO has collapsed by 79% or $5,520,657.80. ¶71.

**F.     RDF**

177.    Riverside Bank purchased $9,972,019.45 of RDF CDOs.  Cohen, as Collateral Manager, and Defendant Sellers jointly prepared the Offering Materials which stated that the CDOs were sold pursuant to a "condition"-specific rating. *See* RDF 2004-01 OC, at 10-11.

178.    These ratings were materially false since they were inflated for the reasons alleged herein.

179.    The Offering Materials touted the geographic diversity of the underlying collateral debt securities, stating as part of the "portfolio limitations" that "the Collateral Debt Securities [must] have satisfied diversity criteria established by Moody's and achieved a total diversity score of at least 15." RDF OC, at 33.

180.    In explaining the need for such diversity, the Offering Materials stated:

"significant correlation has been identified between bank default rates and the geographical region in which defaulting banks are located, indicating that diversification of a portfolio of bank debt *among geographical regions may reduce the default risk profile of such a portfolio. The total diversity score has been taken into account in structuring the portfolio of Collateral Debt Securities*.
*Id. (emphasis added).*

181.    The above statements, ¶¶179-80, were false and misleading because they all failed to disclose that (a)  the purported "diversity" of the collateral had been erroneously used to inflate the ratings of the CDO; (b) geographic diversity was not a meaningful positive factor particularly since there was little consideration of overlapping risks faced by geographically diverse banks; and that c) the Sellers and Managers had effectively undermined any benefit of diversification by selling the CDOs to the same institutions that issued the underlying collateral thereby exposing all of the collateral institutions to the same geographical and market risks.

182.    Further, the Offering Materials did not disclose to investors the collateral securities, instead describing only the "eligibility criteria."  *See* RDF 2004-01 OC, at 32-33.

183.    The RA Defendants were also stated to have a gatekeeper function approving the inclusion of specific collateral securities, both at the beginning and in an ongoing basis for replacement collateral.  *See* RDF 2004-01 OC, at 41.

184.    These statements, ¶¶182-83, evidenced that the structure of the CDOs precluded meaningful due diligence of the underlying collateral as alleged herein.

185.    The RDF Offering Materials purported to disclose conflicts of interest associated with the parties involved in the RDF Offering but again made no mention of conflicts associated with the RA Defendants involvement in the creation, structuring or rating of the CDO.  *See* RDF 2004-01 OC, at 17.

186.    These statements were materially false and misleading since there was no disclosure of the conflicts of interests of the RA Defendants including that: a) the RA Defendants were engaged by way of ratings shopping practices; b) the RA Defendants deployed inflated models to produce inflated ratings; c) the RA Defendants were not independent because they structured the CDOs as well as rated them; and that d) the same representatives who rated the

CDOs also negotiated the RA Defendant fees or were aware of the RA Defendants profit interests in obtaining the engagement.

187.    On April 9, 2009, Fitch downgraded the RDF CDO substantially to junk bond levels, as stated in ¶71.

188.    As a result, the value of the RDF CDO has collapsed by 48.2% or $4,803,714.22. ¶71.

## VI.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(Common Law Fraud against All Defendants)

189.    Repeats the allegations in paragraphs 1 through 188.

190.    The CDOs were all marketed and sold to Riverside outside of the State of New York. The Sellers and Collateral Managers and RA Defendants were each aware that its misrepresentations and omissions would be used and relied on by Riverside in determining whether to purchase the CDOs.

191.    As described above, the Offering Materials contain numerous material misrepresentations and omissions.

192.    Defendant Sellers, as the broker-dealers that sold the CDOs to Riverside, and Defendant Collateral Managers, drafted the Offering Materials and directly solicited Riverside to purchase the CDOs.  They are liable for their misrepresentations and omissions.  Furthermore, the Collateral Managers are liable for the misrepresentations and omissions in the offering materials.  The misrepresentations and omissions by the Defendants were intentional and were made with knowledge of their falsity or were (at the very least) reckless or negligent.

193.    Riverside justifiably relied on the misrepresentations described above.  CDOs are extraordinarily complex financial instruments. It would not have been possible to discover defendants' misrepresentations and omissions without extensive expertise, and unreasonable expenditure of resources to analyze the CDOs and their collateral, all of which Riverside justifiably relied on Defendants, most notably the RA Defendants, to do. Further, as alleged, the Defendants withheld critical facts necessary for due diligence such as the identity of the CDO collateral and the result of the shadow ratings of the institutions issuing the trust preferred securities. Indeed, Defendants solicited Riverside to purchase the CDOs specifically on the basis of their expertise in conducting this sort of due diligence and analysis and sold the fact that investors could rely on them rather than conduct such due diligence themselves.

194.    Defendant Parent Companies are liable for the fraud of their subsidiaries.

195.    As a result of the foregoing, Riverside is entitled to judgment directing rescission of its purchases of the Notes included above and directing return to Riverside of the purchase price of the notes, together with interest. Riverside hereby tenders the CDO notes to the Defendant Sellers.

196.    In the alternative, as a result of the foregoing, Defendants are liable to Riverside in an amount sufficient to compensate for the damages suffered by Riverside as a result of their fraud, which amount exceeds approximately $132 million.

197.    In addition, because the fraud of the Defendants was intentional, willful, and malicious, Riverside is entitled to an award of punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Negligent Misrepresentation against All Defendants)

198.    Repeats the allegations in paragraphs 1 through 197.

199.    The CDOs were all marketed and sold to Riverside outside of the State of New York. The Sellers and Collateral Managers and RA Defendants were each aware that its misrepresentations and omissions would be used and relied on by Riverside in determining whether to purchase the CDOs.

200.    Defendants intended that Riverside rely on their misrepresentations and omissions in purchasing the CDOs, and Riverside did so. If Riverside had been aware of the true facts regarding the notes, the underlying collateral, and the RA Defendants complicit conflicts of interest relating to the CDOs, it would not have purchased the notes.

201.    Defendant Sellers sold the notes to Riverside.  The Collateral Managers for the CDOs owed a fiduciary duty to Riverside.  Defendant Sellers communicated directly with Riverside in making the misrepresentations and omissions described above, in soliciting Riverside to purchase the notes in reliance on their misrepresentations and omissions, and in procuring and consummating the sale of the CDOs based on their misrepresentations and omissions.

202.    As a result of the foregoing, Riverside is entitled to judgment directing rescission of its purchase of the notes and directing return to Riverside of the purchase price of the notes, together with interest.  Riverside hereby tenders the CDO notes.

203.    In the alternative, as a result of the foregoing, Defendants are liable in an amount sufficient to compensate for the damage caused by their unlawful conduct, which amount exceeds approximately $132 million.

204.    Defendant Parent Companies are liable for the fraud of their subsidiaries.

**THIRD CAUSE OF ACTION**
(Breach of Fiduciary Duty against Defendant Managers)

205.    Repeats the allegations in paragraphs 1 through 204.

206.    The CDOs were all marketed and sold to Riverside outside the State of New York. Defendant Collateral Managers owed a fiduciary duty to the investors who purchased the CDO notes, including Riverside.

207.    Defendant Collateral Managers breached their fiduciary duty to the CDO noteholders, including Riverside, by, among other things, failing to properly monitor the collateral and mitigate losses, and by failing to disclose known quality and performance problems with the underlying collateral and thereby aiding and abetting the fraud of the primary wrongdoers identified in the first cause of action.  Finally, the Collateral Managers breached their fiduciary duties to Riverside by making the misrepresentations and omissions referenced in the first cause of action.

208.    The Collateral Managers are liable to Riverside for the damage caused by their breaches of fiduciary duty, in an amount exceeding approximately $132 million.

209.    In addition, Riverside is entitled to an accounting of all amounts received by Defendants from Riverside or in connection with the notes, together with judgment imposing a constructive trust on all such amounts for the benefit of Riverside.

210.    In addition, because the breaches of fiduciary duty by Defendants were intentional, willful and malicious, Riverside is entitled to an award of punitive damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
(Aiding and Abetting Breach of Fiduciary Duty against Defendant Sellers and RA Defendants)

211.    Repeats the allegations in paragraphs 1 through 210.

212.    The CDOs were all sold to Riverside outside the State of New York. Defendant Sellers and the RA Defendants aided and abetted the breaches of fiduciary duty by the Collateral Managers by knowingly providing material assistance to such breaches of fiduciary duty.

213.    Defendant Sellers provided that assistance by offering the CDO Notes for sale in an unregistered offering, purportedly under SEC Rule 144A.  In addition, the Offering Materials (published in the name of Defendant Sellers, among others) were materially false.  The Sellers were aware of this and participated in making the misrepresentations and omissions contained in those Offering Materials.

214.    The RA Defendants provided that assistance by providing inflated ratings on which it understood investors such as Riverside would reasonably rely.

215.    The Sellers are liable to Riverside for the damages caused by their unlawful conduct, in an amount exceeding approximately $132 million.

## FIFTH CAUSE OF ACTION
(Breach of Contract against All Defendants)

216.    Repeats the allegations in paragraph 1 through 215.

217.    Between 2005 and 2007, Riverside and Sellers entered into contracts pursuant to which Riverside purchased, and Sellers sold, the CDO notes.  It was a material term of that contract that the representations Defendants set forth in writing in the Offering Materials were true and correct and that all material information had been disclosed to Riverside.  Sellers breached their contracts with Riverside because the representations made in connection with the sale of the notes were false and Defendants failed to disclose material information to Riverside, including without limitation the fact that the RA Defendants were involved in structuring the same notes they rated,  the fact that the underlying collateral was impaired, the fact that the due diligence and monitoring of the collateral was inadequate, the fact that the loss projection and default models used in the CDO were unreliable and wrong, the fact that the ratings of the notes were falsely inflated, and the fact that the tranche structure of the notes did not confer the safety benefits represented by Defendants.

218.     Defendant Collateral Managers breached their obligations under the Indenture by failing to disclose to Riverside that the ratings of the underlying collateral were inflated, the known quality and performance problems with the collateral, that the due diligence and monitoring of the collateral was inadequate, that the loss and default projection models used in the CDO were unreliable and wrong, and that the collateral was dependent on continued home price appreciation.

219.     RA Defendants breached their obligations by failing to provide an independent assessment of the CDOs and the underlying collateral as a result of the rampant conflicts of interest associated with their role in structuring the CDOs.

220.     The Defendants are liable to Riverside for the damages caused by their breach of contract, in an amount exceeding approximately $132 million.

## SIXTH CAUSE OF ACTION
### (Rescission of Contract)

221.     Repeats the allegations in paragraphs 1 through 220.

222.     As a result of the material misrepresentations and omissions described above, Riverside is entitled to judgment rescinding the contracts of sale for the notes and directing Defendant Sellers to return the purchase price for the notes, together with interest. Riverside hereby tenders its CDO notes to Defendant Sellers.

## SEVENTH CAUSE OF ACTION
### (Mutual Mistake)

223.     Repeats the allegations in paragraphs 1 through 222.

224.     Riverside pleads this cause of action in the alternative to its contention that Defendant Sellers intentionally defrauded it.

225.   Riverside entered into the contract to purchase the CDOs based on the following mistakes of fact:

      a.   That the collateral underlying the notes was diversified and not correlated;

      b.   That the notes had actually and objectively satisfied the standards to be assigned the investment grade ratings they were in fact assigned.

      c.   That the overcollateralization and tranched structure of the CDOs would protect Riverside's notes from losses or declines in value.

      d.   That the loss and default models applied by the RA Defendants, Defendant Managers and by Defendant Sellers to the notes were reasonable, accurate, and reliable for predicting their performance.

226.   If Defendant Sellers were also unaware of and mistaken about any of the foregoing facts, then the contracts of sale for the notes was based upon a mutual mistake of material fact.

227.   In that event, Riverside is entitled to rescission of those contracts and return of its purchase price for the notes, together with interest. Riverside hereby tenders the notes to Defendant Sellers.

**WHEREFORE**, Plaintiff demands judgment as follows:

(1)   On the first through fifth causes of action, monetary damages in an amount sufficient to compensate Riverside for its losses, which amount exceeds approximately $132 million and as to be determined further;

(2)   On the first, second, sixth, and seventh causes of action, judgment determining that the contract of sale between Defendant Sellers and Riverside is rescinded, and directing Sellers to return to Riverside the purchase price for the notes;

(3)     On the third cause of action, judgment directing an accounting of all amounts received by Defendants from Riverside or in connection with the notes, together with judgment imposing a constructive trust on all such amounts for the benefit of Riverside;

(4)     On all causes of actions, an award of interest, costs and disbursements, and attorneys' fees;

(5)     An award of punitive damages in an amount to be determined at trial; and,

(6)     Such further relief as the Court deems proper.

Dated:    New York, New York
            November 13, 2009

Respectfully submitted,

_____

Joel P. Laitman
Christopher Lometti
Daniel B. Rehns
Kenneth M. Rehns
Cohen Milstein Sellers & Toll, PLLC
150 East 52nd Street
Thirtieth Floor
New York, New York 10022
Tel:    (212) 838-7797
Fax:   (212) 838-7745

Steven J. Toll
Cohen Milstein Sellers & Toll, PLLC
1100 New York Ave.
Suite 500, West Tower
Washington DC 20005
Tel:    (202) 408-4600
Fax:   (202) 408-4699

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------------- X

| | |
|---|---|
| RIVERSIDE NATIONAL BANK OF FLORIDA ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| THE MCGRAW-HILL COMPANIES, INC., ) | **VERIFICATION** |
| MOODY'S INVESTORS SERVICE, INC., FITCH, ) | |
| INC., TABERNA CAPITAL MANAGEMENT, LLC, ) | |
| TRAPEZA CAPITAL MANAGEMENT, LLC, ) | |
| COHEN & COMPANY FINANCIAL ) | |
| MANAGEMENT, LLC f/k/a COHEN BROS. ) | Index No.: |
| FINANCIAL MANAGEMENT LLC, FTN ) | |
| FINANCIAL CAPITAL MARKETS, KEEFE ) | |
| BRUYETTE & WOODS, INC., MERRILL LYNCH, ) | |
| PIERCE, FENNER & SMITH, INC, JPMORGAN ) | |
| CHASE & CO., J.P. MORGAN SECURITIES, INC, ) | |
| CITIGROUP GLOBAL MARKETS., CREDIT ) | |
| SUISSE SECURITIES (USA) LLC, ABN AMRO, ) | |
| COHEN & COMPANY, and SUNTRUST ) | |
| ROBINSON HUMPHREY, INC., ) | |
| ) | |
| Defendants. ) | |

---------------------------------------------------------------- X

(STATE OF NEW YORK    )
(CITY OF NEW YORK     )
(COUNTY OF NEW YORK   )

Kenneth M. Rehns, being duly sworn, states that he is one of the attorneys for Plaintiff in this action and that the foregoing complaint is true to his own knowledge, except as to matters therein stated on information and belief and as to those matters he believes to be true; that the ground of his belief as to all matters not stated upon his knowledge are upon review of publicly available information filed with the United States Securities and Exchange Commission, media and newspaper articles and information contained on the internet; and that the reason why the verification is not made by Plaintiff is that Plaintiff, Riverside National Bank of Florida, is not in the county where Plaintiff's attorney has their office.

Kenneth M. Rehns

Notary Public

Sworn to me before this
13th day of November 2009

THERESA A. GRAHAM
Notary Public, State of New York
No. 01GR5054854
Qualified in Bronx County
Commission Expires Jan. 29, 2010